Stan D. Blyth #166938
Zena M. Sin #332804
CREEDE-BLYTHE LAW, APC
5424 N. Palm Ave, Suite 108
Fresno, California 93704
Phone: (559) 554-3005
Fax: (559) 554-3054
E: sdb@c-blaw.net
E: zms@c-blaw.net

Attorneys for KEVIN ASSEMI

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN ASSEMI, individually and derivatively on behalf of ELEVATED AG, LLC, a California limited liability company,<br><br>               Plaintiffs,<br><br>v.<br><br>FARID ASSEMI, an individual; FARSHID ASSEMI, an individual; DARIUS ASSEMI, an individual; ASSEMI GROUP, INC., a California corporation; MARICOPA ORCHARDS, LLC, a California limited liability company; NADER MALAKAN, an individual; MALAKAN INVESTMENTS, LLC, a California limited liability company; JEREMY A. YUROSEK, in his capacity as Trustee of the Jeremy J. Yurosek Trust, dated December 26, 2008; DEVON YUROSEK AND JEFFREY YUROSEK, in their capacities as Trustees of the Devon J. Yurosek Trust, Dated December 26, 2008; JOHN A. BEZMALINOVIC, an individual; JASON HOLLRAH, an individual; ELIZABETH STEINHAUER-CLARK, an individual and DOES 1-50, inclusive,<br>               Defendants,<br><br>-and-<br><br>ELEVATED AG, LLC, a California limited liability company,<br><br>               Nominal Defendant. | CIVIL ACTION NO. 1:23-CV- 01741-EPG<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DIRECT CLAIMS FOR**:<br><br>(1) Fraud in the Inducement<br>(2) Breach of Contract - (Failure to Make Contributions)<br>(3) Breach of Contract - (Failure to Make Additional Capital Contributions)<br>(4) Breach of Contract - (Failure to Comply with Contract Terms in Purchase of Minority Member Interest)<br>(5) Breach of the Duty of Care<br>(6) Unfair Business Practices<br>(7) Negligent Misrepresentation<br>(8) Misappropriation/Conversion<br>(9) Breach of the Obligation of Good Faith and Fair Dealing<br>(10) Breach of the Duty of Care<br>(11) Wrongful Termination in Violation of Public Policy<br>(12) Retaliation in Violation of California Labor Code Section 1102.5<br>(13) Civil Extortion<br>(14) Breach of Contract – (Failure to Pay in Full Severance)<br>(15) Misappropriation of Trade Secrets<br>(16) Declaration of Rights<br>(17) Accounting<br>(18) Unjust Enrichment<br>(19) Misappropriation/Conversion<br>(20) Malpractice<br>(21) Constructive Trust |

**DERIVATIVE CLAIMS FOR**:
(1) Intentional Interference with Prospective Economic Advantage
(2) Breach of the Obligation of Good Faith and Fair Dealing
(3) Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity; 18 U.S.C. §§ 1961(5), 1962(b) RICO
(4) Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c)
(5) Conspiracy to Engage in a Pattern of Racketeering Activity; 18 U.S.C. §§ 1961(5), 1962(d)
(6) Breach of Fiduciary Duty
(7) Abuse Of Control And Gross Mismanagement
(8) Corporate Waste
(9) Unjust Enrichment
(10) Misappropriation/Conversion

Plaintiff KEVIN ASSEMI ("**Plaintiff**" or "**KEVIN**"), individual and derivatively on behalf of  ELEVATED AG, LLC ("**ELEVATED**" or "**Nominal Defendant**"), a California limited liability company hereby sues **FARHID ASSEMI**, an individual; **FARSHID ASSEMI**, an individual; **DARIUS ASSEMI**, an individual; **ASSEMI GROUP, INC**., a California corporation; **MARICOPA ORCHARDS, LLC**, a California limited liability company; **NADER MALAKAN**, an individual; **MALAKAN INVESTMENTS, LLC**, a California limited liability company; **JEREMY A. YUROSEK**, in his capacity as Trustee of the Jeremy J. Yurosek Trust, dated December 26, 2008; **DEVON YUROSEK** and **JEFFREY YUROSEK**, in their capacity as Trustees of the Devon J. Yurosek Trust, Dated December 26, 2008; **JOHN A. BEZMALINOVIC**, an individual; **JASON HOLLRAH**, an individual; **ELIZABETH STEINHAUER-CLARK**, an individual; and DOES 1-50, inclusive (collectively "**Defendants**"), and in support thereof states, as follows:

///

///

///

2

**STANDING AND VENUE**

1.      At all times mentioned herein, Plaintiff was and is an individual residing in Fresno County, California.

2.      At all times mentioned herein, Nominal Defendant is a California limited liability company with its principal place of business located in Fresno, County California.

3.      At all times mentioned herein, Defendant MARICOPA ORCHARDS, LLC, was and is a California limited liability company ("**MARICOPA**") with its principal place of business located in Fresno, County California. MARICOPA is subject to suit under the California Fair Employment and Housing Act, Government Code section 12900, et seq. ("**FEHA**"), in that MARICOPA was, and is, an employer who regularly employed five (5) or more person

4.      At all times mentioned herein, Defendant ASSEMI GROUP, INC. was and is a California corporation ("**ASSEMI**") with its principal place of business located in Fresno County, California. ASSEMI is subject to suit under the FEHA, in that ASSEMI was, and is, an employer who regularly employed five (5) or more persons.

5.      At all times mentioned herein, Defendant FARID ASSEMI ("FARID") was and is an individual residing in Fresno County, California.

6.      At all times mentioned herein, Defendant FARSHID ASSEMI ("**FARSHID**") was and is an individual residing in Fresno County, California.

7.      At all times mentioned herein, Defendant DAIRUS ASSEMI ("**DARIUS**") was and is an individual residing in Fresno County, California.

8.      At all times mentioned herein, Defendant NADER MALAKAN ("**MALAKAN**") was and is an individual residing in Fresno County, California.

9.      At all times mentioned herein, Defendant ELIZABETH STEINHAUER-CLARK ("**CLARK**") was and is an individual residing in Fresno County, California.

10.      At all times mentioned herein, Defendant MALAKAN INVESTMENTS LLC,

was and is a California limited liability company ("**MALAKAN INVESTMENTS**") with its principal place of business located at 1334 West Herndon Ave., Fresno, California 93711.

11.    At all times mentioned herein, Defendant JEREMY A. YUROSEK, as Trustee of the Jeremy J. Yurosek Trust, dated December 26, 2008 ("**JEREMY**"), on information and belief, was and is an individual residing in Kern County, California.

12.    At all times mentioned herein, Defendants DEVON YUROSEK and JEFFREY YUROSEK, as Trustees of the Devon J. Yurosek Trust, Dated December 26, 2008 (jointly "**DEVON**"), on information and belief, were and are individuals residing in Kern County, California.

13.    At all times mentioned herein, JOHN A. BEZMALINOVIC ("**BEZMALINOVIC**"), was and is an individual residing in Fresno County, California.

14.    At all times mentioned herein, JASON HOLLRAH ("**HOLLRAH**"), was and is an individual residing in Fresno County, California.

15.    Plaintiff is a Member and the majority owner of Nominal Defendant. Plaintiff brings this action individually and as derivative action brought for the benefit of Nominal Defendant (*PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal. App. 4th 958, 963, {"The principles governing derivative actions in the context of corporations apply to limited liability companies}; *Denevi v. LGCC* (2004) 121 Cal.App.4th 1211, 1221-1222; see *Goles v. Sawhney* (2016) 5 Cal.App.5th 1014, 1018264, fn. 3) "[I]t is settled that one who has suffered injury both as an owner of a corporate entity and in an individual capacity is entitled to pursue remedies in both capacities." )

16.    Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned there existed a unity of interest and ownership between Defendant MARICOPA, on the one hand, and FARSHID, on the other, such that any individuality and separateness between them has ceased, such that they are alter egos, of one another.

17.    Plaintiff is informed and believes and, on that basis, alleges that MARICOPA, at all times herein mentioned was, a mere shell and sham that operates as the alter ego of FARID,

DARIUS and FARSHID, used for their personal benefit and advantage, in that of FARID, DARIUS and FARSHID have at all relevant times mentioned in this Complaint exercised total dominion and control over MARICOPA.

18.    Plaintiff is informed and believes and, on that basis, alleges that ASSEMI, at all times herein mentioned was, a mere shell and sham that operates as the alter ego of FARID, DARIUS and FARSHID, used for their personal benefit and advantage, in that of FARID, DARIUS and FARSHID have at all relevant times mentioned in this Complaint exercised total dominion and control over ASSEMI;

19.    Plaintiff is informed and believes, and on that basis alleges, that allowing FARID, DARIUS and FARSHID to retain the benefits of MARICOPA would work a fraud or injustice on Plaintiff.

20.    Plaintiff is informed and believes, and on that basis alleges, that allowing FARID, DARIUS and FARSHID to retain the benefits of ASSEMI would work a fraud or injustice on Plaintiff.

21.    Plaintiff is informed and believes, and on that basis allege that at all relevant times, each Defendant was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest, and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other Defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other Defendants so as to be liable for their conduct with respect to the matters alleged below.

22.    Plaintiff is informed and believes, and on that basis alleges that each Defendant acted pursuant to and within the scope of the relationships alleged above, that each Defendant knew or should have known about, and authorized, ratified, adopted, approved, controlled, and aided and abetted the conduct of all other Defendants.

23.    The true names and capacities, whether individual, corporate, partnership, associate, or otherwise, of the Defendants named herein as DOES 1 through 50, inclusive, are

presently unknown to Plaintiff, who therefore sues these Defendants by fictitious names. Plaintiff will seek leave of Court to amend this Complaint to allege their true names and capacities as soon as they are ascertained.  Plaintiff further alleges, on information and belief, that each of these fictitiously named Defendants is responsible in some manner for the acts alleged herein.

24.    Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kern County, California, Assessor's Parcel Number 220-050-49.

25.    Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kern County, California, Assessor's Parcel Number 220-050-012.

26.    Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kern County, California, Assessor's Parcel Number 220-050-69.

27.    Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kern County, California, Assessor's Parcel Number 220-050-71.

28.    Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kern County, California, Assessor's Parcel Number 220-211-24.

29.    Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in

that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 078-090-26S.

30.  Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 078-080-57S.

31.  Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 078-090-22S.

32.  Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 078-090-02S.

33.  Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 078-090-27S.

34.  Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 085-090-77S.

35.  Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 085-090-57S.

36.  Plaintiffs are informed and believe and thereon allege that Defendant

MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Fresno County, California, Assessor's Parcel Number 085-090-78S.

37.     Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kings County, California, Assessor's Parcel Number 038-380-018-000.

38.     Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kings County, California, Assessor's Parcel Number 036-170-042-000.

39.     Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kings County, California, Assessor's Parcel Number 036-170-039-000.

40.     Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kings County, California, Assessor's Parcel Number 036-170-037-000.

41.     Plaintiffs are informed and believe and thereon allege that Defendant MARICOPA, are, and at all times herein mentioned were, the owners or reputed owners, and, in that capacity, claim to own fee title or hold leasehold, guarantor, or other interests in the real property situated in Kings County, California, Assessor's Parcel Number 036-170-038-000.

42.     Hereinafter, Plaintiff collectively refers to all real properties identified in above as "**Severance Properties**".

## JURISDICTION AND VENUE

43.     The harms and obligations sued upon were incurred and occurred in Fresno

1    County.  This Court is the proper court for the trial of this action.

2        44.    Jurisdiction is premised upon the fact that the damages suffered by Plaintiff are

3    in excess of the minimum sum required for unlimited jurisdiction in the Superior Court of the

4    State of California.

5        45.    Venue and jurisdiction are proper in this county as the subject agreement was

6    reached, and the resulting harm occurred, in Fresno County.

7        46.    Venue and jurisdiction are also proper in this county as, upon information and

8    belief, MARICOPA, ASSEMI and Nominal Defendant transact business in Fresno County.

9        47.    Venue and jurisdiction are also proper in this county as, upon information and

10   belief, this is the county where the injuries to Plaintiff occurred.

11       48.    Plaintiff has timely filed a complaint against MARICOPA and ASSEMI with the

12   California Department of Fair Employment and Housing ("DFEH") containing the allegations

13   herein expressed. Accordingly, he has exhausted his administrative remedies with the DFEH.

14   The DFEH issued Plaintiff a right to sue notice dated December 14, 2023. This complaint is

15   timely filed within three hundred and sixty-five (365) days from the date of that notice.

16       49.    Plaintiff brings certain causes of action herein derivatively in the right of and for

17   the benefit of ELEVATED to redress injuries suffered and to be suffered by ELEVATED as a

18   result of the Defendant members of ELEVATED, to wit: MARICOPA, MALAKAN

19   INVESTMENTS, DEVON and JEREMY and their breaches of fiduciary duty, abuse of control,

20   and gross mismanagement of the Nominal Defendant.  Plaintiff and his counsel will adequately

21   and fairly represent the interests of ELEVATED in enforcing and prosecuting its rights in this

22   action.

23       50.    Plaintiff was a Member of ELEVATED at the time of the wrongdoing

24   complained of, has continuously been a Member, and is a current Member.

25       51.    Plaintiff has not made any demand on FARSHID or MALAKAN, who

26   unlawfully attempted to appoint themselves as Managers of ELEVATED, to investigate and

27   prosecute the wrongdoing alleged herein.  Such a demand is excused because:  (i) they are not

28

the rightful managers of ELEVATED; (ii) making a demand would be a futile and useless act as the purported Managers have been involved in the wrongdoing alleged herein and would not be able to conduct an independent and objective investigation of their own alleged wrongdoing; and (iii) the wrongful conduct of Defendants FARSHID and MALAKAN is not subject to protection under the business judgment rule as codified in Section 309 of California's Corporations Code. Under such circumstances, the demand requirement is excused since making such a demand on Defendants FARSHID and MALAKAN would be futile (See Findley v. Garrett (1952) 109 Cal.App.2d 166, 174; Shields v. Singleton (1993) 15 Cal.App. 4th 1611, 1622.) Furthermore, Defendants FARSHID and MALAKAN have demonstrated no intention of stopping their illicit practices which have resulted in the wrongful conduct and damage to ELEVATED alleged herein.

52.     Furthermore, purported Defendant Managers FARSHID and MALAKAN have sought personal gains over lawful corporate operations.   The misconduct of Defendants FARSHID and MALAKAN resulted in the wrongful conduct at issue herein by Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY, all of which lack the objectivity to judge their own misconduct.

53.     Neither of the purported Defendant Managers FARSHID and MALAKAN are independent or disinterested because their decision to operate ELEVATED in violation of law is not a protected business decision and they face a substantial likelihood of liability for breaching their duty of loyalty.  Purported Defendant Managers FARSHID and MALAKAN have profited from, caused, ratified, and/or aided and abetted in the wrongful conduct alleged herein. Purported Defendant Managers FARSHID and MALAKAN further enriched themselves at the expense of ELEVATED to which they owed fiduciary duties of good faith, honesty, and loyalty. At all times herein relevant, purported Defendant Managers FARSHID and MALAKAN have withheld funds intended for ELEVATED, forced distributions intended to fund ELEVATED's business to be used to repay a loan for FARSHID's personal benefit, and taking the resultant tax deduction for his own benefit, while purported Defendant Manager MALAKAN

usurped business opportunities intended for ELVEATED to his own benefit, including the theft of intellectual property and nursery stock intended for planting on ELEVATED's real property. Thus, purported Defendant Managers FARSHID and MALAKAN could not exercise independent objective judgment in deciding whether to bring this action nor in vigorously prosecuting the claims alleged herein.

54.   Purported Defendant Managers FARSHID and MALAKAN were personally and directly involved in the acts of mismanagement, abuse of control and waste  alleged and who each approved the actions complained of herein. Purported Defendant Managers FARSHID and MALAKAN received personal and financial benefits while they caused or permitted the misconduct detailed in this Complaint. Purported Defendant Managers FARSHID and MALAKAN are biased and cannot appropriately and fairly adjudicate any demand on the managers of ELEVATED.

55.   Plaintiff also brings an action under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), which is codified in 18 U.S.C. §1961. While RICO provides for a claim in federal district court, it has been held that California state courts have concurrent jurisdiction over such claims. (Ciani v. Superior Court (1985) 40 Cal.3d 903, 908; "[C]oncurrent jurisdiction over [18 U.S.C.] § 1964(c) suits," … "is clearly not incompatible with §3231 itself, for civil RICO claims are not 'offenses against the laws of the United States,' §3231, and do not result in the imposition of criminal sanctions—uniform or otherwise." (Tafflin v. Levitt (1990) 493 U.S. 455, 464, 110 S.Ct. 792.) Aimed at "racketeering activities", RICO creates a private cause of action for treble damages by providing "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate … court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fees." (18 U.S.C. §1964(c).)

## FACTS COMMON TO ALL COUNTS

### Maricopa Employment and Unlawful Termination

56.   In or about 2010, Plaintiff, a licensed California attorney, came to work as an

attorney in the legal department for the ASSEMI GROUP (then known as Granville Holdings) of which MARICOPA is an affiliate, and thereafter held various positions, including, tax and real estate counsel for the company, eventually being promoted to the Chief Executive Officer ("**CEO**") of MARICOPA in May of 2019.

57.     Upon his promotion to President of ASSEMI and Plaintiff taking on oversight of the overall operations of ASSEMI and its affiliates, including but not limited to MARICOPA (the "**ASSEMI AFFILIATES**"), in recognition of the fact that Plaintiff had been underpaid historically, Plaintiff was promised an annual salary of Three Million Two Hundred Thousand Dollars ($3,200,000.00) by his father FARID, acting in his capacity as Chairman of ASSEMI; which salary was ratified by all of the owners/shareholders of ASSEMI; however, FARID subsequently reduced and deferred Plaintiff's salary to $200,000, at the influence of HOLLRAH, justifying the reduction as a way to prevent Plaintiff from incurring a large tax liability.

58.     After reducing Plaintiff's salary to Two Hundred Thousand Dollars ($200,000.00), on May 1, 2019, Plaintiff and FARID agreed that Plaintiff, as an owner in ASSEMI and the ASSEMI AFFILIATES, would be paid the sum of Six Million Dollars ($6,000,000.00) for 2019, for the true value he had brought to the companies, as Plaintiff had achieved millions of dollars in savings for the company, which savings prevented ASSEMI and the ASSEMI AFFILIATES from becoming insolvent, allowing the companies to continue to meet their financial obligations and pay their employees. This includes delaying the payment of the nearly forty million dollars ($40,000,000) in obligations for eighteen months, saving thirty million in interest by delaying the origination of a bond issuance with no effect liquidity, structuring of a $100 Million thirty year public bond, increasing the sale price and ensuring the success of the sale of three hundred eighty million ($380 Million) sale of 10,000,000 acres of almond farmland, preventing a prepayment penalty of fifty million dollars of interest ($50,000,000), structuring a novel method to legally make available one hundred million dollars of cash flow to fortify the ASSEMI family position through a combination of Exchanges under Internal Revenue Code 1031 (1031 exchanges) and cleaning up complex land transactions. On

or about February 14, 2022, SME Partners, LLC, an affiliate of MARICOPA, entered into Loan Agreements and Promissory Notes with each of DEVON and JEREMY (jointly "**Borrowers**") for a total of $1.8 Million ($900,000 each) (the "**Loans**"). The Loans were to be used to fund a portion of DEVON and JEREMY's initial capital contributions to ELEVATED.  However, the funding of the Loans was not a condition precedent to the obligation of DEVON and JEREMY to make their initial capital contributions to ELEVATED.

59.     On or about February 14, 2022, SME Partners, LLC ("**SME**"), an affiliate of ASSEMI entered into Loan Agreements and Promissory Notes with each of DEVON and JEREMY (jointly "Borrowers") for a total of $1.8 Million  ($900,000 each) (the "Loans"). The Loans were to be used to fund the major portion of DEVON and JEREMY's initial capital contributions to ELEVATED.  However, the funding of the Loans was not a condition precedent to the obligation of DEVON and JEREMY to make their initial capital contributions to ELEVATED.

60.     In conjunction with the Loans, on February 14, 2022 (the "**Pledge Effective Date**"), DEVON and JEREMY also executed Pledge Agreements pledging the Borrowers' Membership Interests in ELEVATED as security for the Loans. The Pledge Agreements state that the Loans had been funded as of the Pledge Effective Date of February 14, 2022, when in fact the Loans had not yet been funded.  Beginning in 20___, Plaintiff noticed with great concern that FARID was beginning to forget things and make bad financial decisions that were to the detriment of MARICOPA and that FARID would attack Plaintiff for the success and savings he was achieving as CEO of MARICOPA.

61.     Plaintiff, along with Neema Assemi, as Trustees of family trusts were owner/managers of SME, the lending entity committed to making the Loans. SME was represented by BEZMALINOVIC, who also acted as General Counsel for ASSEMI and the ASSEMI AFFILIATES, including MARICOPA. On or about February 14, 2022, Plaintiff, as one of the managers of SME, instructed HOLLRAH, then the Chief Financial Officer of ASSSEMI and the ASSEMI AFFILIATES, and a non-owner, and also a manager of SME, the

affiliated funding entity for the Loans, to fund the Loans; however, HOLLRAH, disregarded Plaintiff's instructions in violation of lending laws, and failed and refused to fund the Loans, notwithstanding that the Loan documents stated that the Loans had been funded on February 14, 2022, and notwithstanding ELEVATED's need for the funding to meet its ongoing financial obligations.

62.     Beginning in 2018, Plaintiff noticed great concern that FARID was beginning to forget things and make bad financial decisions that were to the detriment of ASSEMI and the ASSEMI AFFILIATES and that FARID would for no reason attack Plaintiff for the success and savings he was achieving as CEO.

63.     Given his great concern for his father FARID, Plaintiff and the second generation of the Assemi family many who were the beneficiaries of the Trust which he owed a fiduciary duty and cared for, approached DARIUS and FARSHID to discuss his father's forgetfulness and his recent propensity, irrational and uncontrolled emotional outbursts, and for making poor financial decisions that were working to the detriment and financial stability of ASSEMI and the ASSEMI AFFILIATES, as Plaintiff believed his father was experiencing issues with his health that were leading to his forgetfulness and poor decision-making.

64.     After reaching out to DARIUS and FARSHID to discuss his father's condition, Plaintiff was notified in November 2019 that he was being terminated from his position as CEO. FARID, ASSEMI and MARICOPA agreed to pay Plaintiff an $11.5 million severance payment, among other consideration including approximately $1 million in specific recharge ground, shifting ownership from Plaintiff's trust to him individually, to capture flood water in the Westlands Water District (the "**Severance Agreement**"). Included within the Severance Agreement are portions and/or parcels of the Severance Property. FARID, ASSEMI, and MARICOPA agreed to continue to employ Plaintiff in a different capacity until the final terms of the Severance Agreement could be memorialized via a written contract.

65.     To date, MARICOPA has only paid $4.5 million in cash flow of the severance amount, despite Plaintiff's reliance on the full payment to fund ELEVATED and its operations.

66.     FARID was subsequently diagnosed in 2021 with a brain tumor and then later the major condition at issue Cerebral Degenerative Ataxia,  a serious disease of the brain.

67.     The salient terms of the Plaintiff's Severance Agreement were reduced to writing. However, the parties agreed to more formally memorialize Plaintiff's severance agreement, including an indemnification provision, land transfers, access to intellectual property owned by Plaintiff, use of the family planes and compliance reporting required by law. On information and belief, Plaintiff, FARID, ASSEMI and MARICOPA agreed that Plaintiff's employment with Defendants, and each of them, would be concluded upon the finalizing and execution of the Severance Agreement. However, following his partial performance, FARID refused through proxy employees to engage in further memorializing of the Severance Agreement.

**Formation of Elevated and Maricopa's Failure to Fund Capital Contribution**

68.     ELEVATED, which started operations earlier in 2020, was formed on or about September 15, 2020, upon the filing of its Articles of Organization with the California Secretary of State, with its initial members being Plaintiff, JEREMY, DEVON, and MARICOPA. Defendant MALAKAN INVESTMENTS was subsequently added as a member of ELEVATED, after Defendant MALAKAN had ensured Plaintiff that he was committed to ELEVATED, would honor and maintain his fiduciary duties to ELEVATED and its members and would not act as a spy for FARID, whose health continued to decline. Notwithstanding MALAKAN's promises, Plaintiff later learned that MALAKAN had become a Member of ELEVATED for the sole purpose of acting as a spy and inside man for FARID.

69.     On or about the end of 2020, the terms of ELEVATED's Operating Agreement were orally agreed to by its members. Under these terms, Plaintiff was to have a 50% controlling Percentage Interest in ELEVATED.

70.     In an email dated April 7, 2022, BEZMALINOVIC, acting as counsel for both MARICOPA and ELEVATED, made a capital call identifying the initial capital call for ELEVATED that needed to be trued up. In exchange for an agreed forty percent (40%) membership interest, as its initial capital contribution to ELEVATED, MARICOPA was to

contribute cash, along with multiple parcels of real property and water rights (to wit: Kern County APNs 220-050-49, 220-050-12, and 220-050-69 with a combined value of more than Eight Million Dollars ($8,000,000.00,) which were delinquent from 2020. Concurrently with the capital contribution of Basic School and Gardner Field by MARICOPA, Plaintiff, JEREMY, DEVON, and MALAKAN INVESTMENTS agreed to make cash capital contributions totaling Eight Million Thirty-Two Thousand Five Hundred Ninety and No/100ths Dollars ($8,032,590), each in accordance with his Percentage Interest in ELEVATED.

71.     Subsequently, after MALAKAN's misrepresentations, Plaintiff accepted MALAKAN INVESTMENTS as a 5% member of ELEVATED.  In return for their 5% interests in ELEVATED, DEVON, JEREMY and MALAKAN INVESTMENTS were each to contribute cash in the amount of $1,006,643. Thereafter, the members' contributions and ownership percentages in ELEVATED were set forth under the terms of a written Operating Agreement, as discussed in greater detail below. MALAKAN INVESTMENTS and MARICOPA failed to make their initial capital contributions in full.

72.     Section 2.8 of the Operating Agreement provides, in relevant part "[A]ny action required or permitted to be taken at a meeting [of Members] may be taken without a meeting if the Members holding at least a majority of the Percentage Interests approve the action under this Agreement or consent thereto in writing."

73.     ELEVATED's written Operating Agreement (the "Operating Agreement") was not executed until February 2022, although it was given a retroactive effective date of September 16, 2020.  (A true and correct copy of the Operating Agreement is attached hereto as **Exhibit A**, and its terms and conditions are incorporated herein as though set forth in full.)

74.     Notwithstanding that he acted as the general counsel for Defendants ASSEMI and MARICOPA, as well as serving as family legal counsel for Plaintiff and Defendants FARSHID, DARIUS and FARID, the Operating Agreement was drafted by BEZMALINOVIC, who also acted as legal counsel for various Members of ELEVATED, including Plaintiff and ELEVATED itself, without obtaining their written consent as required under Rule 1.7 (Conflict

of Interest: Current Clients) of the California Rules of Profession Conduct and under ASSEMI's internal policies.

75.    Under Section 2.1 of the Operating Agreement ("Percentage Interests in Company") in exchange for the initial capital contributions made by each Member, as shown on the books and records of ELEVATED, the Members, after their contributions had been made to the company, were to hold the following percentage interests: Plaintiff 45%; JEREMY 5%; DEVON 5%; MALAKAN 5%; and MARICOPA 40%.

76.    Under Section 4.1 of the Operating Agreement ("Management of Company Business") Plaintiff, DEVON, and JEREMY were to be the initial Managers of ELEVATED, with the sole authority to manage and control the operations and affairs of ELEVATED for the benefit of all of its Members. JEREMY by 2022 had chosen to step down from his role as Manager due to personal reasons.

77.    As of the summer of 2021, MARICOPA had not contributed any sums or property to ELEVATED, no party had, other than Plaintiff who had contributed millions in cash contributions as well as uncompensated time and effort.

78.    On or about December 2021, ELEVATED entered into a deal for funding through a sale lease back to acquire and construct a state of-the-art citrus nursery (the "□ursery Deal"). As part of the due diligence for the Nursery Deal, ELEVATED was required to provide its balance sheet to establish it had assets to justify the lease option, which require that MARICOPA make its initial capital contribution, at latest, before the week of February 10, 2022. However, for no reason other than to undermine the Nursery Deal, MARICOPA transferred less than half of its initial capital contribution on February 11, 2022, one day after the latest possible date to secure the Nursery Deal. The lost opportunity value of the Nursery Deal exceeds $10 million.

79.    On or about April 18, 2022, BEZMALINOVIC, acting as counsel for ASSEMI, MARICOPA and all members of ELEVATED,  made a second capital call for all members, pursuant to Section 2.2 of  the Operating Agreement which provides that if "the Managers (by

vote of a majority of Managers with [Plaintiff] being at least one of such voting majority) determine that the Company requires additional capital to fund its operations, the Managers shall deliver a written capital call notice at least fifteen (15) days in advance of the funding date to the Members of the amount, timing and reason(s) for the additional capital requirement."

80.     Said additional capital call by BEZMALINOVIC was ratified and adopted by the Managers of ELEVATED and required MARICOPA to contribute approximately $300,000.00 in cash and the remaining real property assets and water rights that it had agreed to contribute. Pursuant to this second capital call, Plaintiff was to contribute an additional sum of $337,649.38, MALAKAN was to contribute an additional sum of $37,516.60, JEREMY was to contribute an additional sum of $37,516.60 and DEVON was to contribute an additional sum of $37,516.60.

81.     However, on or about April 18, 2022, BEZMALINOVIC informed the Members of ELEVATED that as a precondition to MARICOPA making the balance of its capital contribution to ELEVATED, which complete contribution was required in order for MARICOPA to obtain a full forty percent interest (40%) in ELEVATED, the Members of ELEVATED would be required to approve a proposed Amended and Restated Operating Agreement for ELEVATED ("**Proposed Restated Agreement**") that would give MARICOPA preferential treatment as a Member of ELEVATED.

82.     Specifically, the Proposed Restated Agreement contained a Put Option that would have, at any time after March 31, 2023, allowed MARICOPA, on its election, to compel ELEVATED to repurchase all of its Percentage Interest in ELEVATED, by delivering written notice to ELEVATED. The purchase price for MARICOPA's minority interest under the Put Option was to have been determined without respect to discounts for lack of marketability or control.

83.     In or about the Spring of 2022, FARID, DARIUS AND FARSHID, (the "**ASSEMI BROTHERS**") and BEZMALINOVIC demanded that Plaintiff pledge ELEVATED's property as part of ASSEMI and the ASSEMI AFFILIATES  $500 million Prudential Bank loan refinancing of the existing $350 million Metropolitan Life financing where

Plaintiff had ensured that there was sufficient financing for ELEVATED. In exchange, the ASSEMI BROTHERS, and MARICOPA, in collaboration with Representative for Prudential, promised, among other things, that they would honor their existing agreement to guarantee loans to ELEVATED, including for term debt and development financing (which was approximately $15 million at 60% loan-to-value). MARICOPA secured its $500 million loan, obtaining approximately $9 million of financing, at 3.53% interest, by encumbering property beneficially owned by ELEVATED ("**ELEVATED**'s Assets") as a "Non-Borrower Trustor," with none of these proceeds going to ELEVATED. However, the ASSEMI BROTHERS and MARICOPA refused to uphold their end of the bargain. The resulting damages include the economic harm of fraudulently inducing ELEVATED to pledge its land as collateral for the Prudential Bank loan refinancing. Separately, Plaintiff's signature, in his capacity as trustee of the Farshid/Sonia Assemi Grantor Trust, on the loan documents was secured by DARIUS using threats and intimidation against Plaintiff, while acting on behalf of all of the ASSEMI BROTHERS. Further, Plaintiff's demands for access to information regarding the financial condition of the Farshid/Sonia Assemi Grantor Trust assets from HOLLRAH, as Trustee and as beneficiary of his own trusts, were denied.

84.    MARICOPA and the ASSEMI BROTHERS had an agreement with Plaintiff, as well as Prudential Bank, to the spin out of a separate loan or loans to ELEVATED in an amount of fifteen million dollars ($15,000,000.00) for takeout and crop financing, which was to be the consideration provided to ELEVATED for its pledge property.  This financing was essential for the care of ELEVATED's current planting and for installation of wind machines to protect the plantings against frost and to secure water assets for ELEVATED.

85.    At the same time that ASSEMI, the ASSEMI AFFILIATES  and the ASSEMI BROTHERS benefited from forcing ELEVATED to allow its assets to be encumbered so that ASSEMI and the ASSEMI AFFILIATES could borrow nine million dollars ($9,000,000.00), ELEVATED was forced into default with its vendors, as approximately $1.5 million dollars of ELEVATED's debt was delinquent and unpaid.

86.     MARICOPA used the Prudential refinancing funds at its Cawelo Ranch and for partial completion of a second planting that had already been delayed one year. MARICOPA did not provide notice to ELEVATED's Managers until mid-planting, putting ELEVATED in delinquency with its vendors, damaging ELEVATED's good will, causing lost profits, increased costs and lost opportunities, and also led to increased pressure for ELEVATED to seek new sources of funding, and this artificial lack of liquidity was provided as a major reason for the resignation of ELEVATED's CFO's who had been hired at great expense, time, and effort to help raise capital, especially in the face of ASSEMI BROTHERS financial inconsistencies.

87.     Neither Plaintiff nor ELEVATED were allowed to participate in structuring the half-billion-dollar refinancing underwritten by Prudential Bank. Such participation was crucial for ELEVATED's survival because Plaintiff had arranged for a later spin out of a separate Prudential loan for ELEVATED in the amount of fifteen million dollars that was to be funded using ELEVATED's Assets as security once these assets were no longer encumbered for the benefit of ASSEMI and the ASSEMI AFFILIATES immediately after the $500 Million refinance was completed  removing encumbrances for the benefit of MARICOPA and its affiliates, having ELEVATED assume take out fixed rate financing and enter into crop financing, as well as complete MARICOPA's in kind property contributions of water rights. All parties, ELEVATED, MARICOPA through BEZMALINOVIC, HOLLRAH, and Bill Sciacqua of Prudential worked together to put in place the financing for ELEVATED.

88.     MARICOPA, in breach of its capital contribution commitment under the Operating Agreement, transferred only two parcels of real property located in Kern County to ELEVATED, to wit: APN 220-211-34 ("**Basic School**") and APN 220-050-71("**Gardner Field**") with only 540 Acre Feet of water rights being transferred with these parcels, failing to transfer the water rights parcels needed for ELEVATED to obtain financing.

89.     On April 7, 2022, a capital call was again made by BEZMALINOVIC, which was ratified by the Managers of ELEVATED, calling for MARICOPA to contribute to ELEVATED approximately $300,000.00 in cash, along with a contribution of the remaining

water rights and land not yet contributed. These contributions were never made by MARICOPA, preventing ELEVATED from planting trees and care of existing orchards. This was due not only to the lack of contribution by MARICOPA, but also due to the fact that the loan to DEVON and JEREMY had still not been fully funded.

90.     On May 26, 2022, ELEVATED's full year budget showed that it required more than $4,200,000.00 in funding.

91.     On July 1, 2022, the financial situation was so desperate for ELEVATED, due to MARICOPA's failure to make its agreed capital contributions, that DEVON emailed BEZMALINOVIC explaining that, among other things, without receiving some funding, ELEVATED's trees would die, ELEVATED would be unable to order trees for the following year, the growth of its trees and fruit would be stunted and that ELEVATED might well be unable to continue its farming operations.

92.     On August 16, 2022, the remaining balance of the Loans to DEVON and JEREMY were finally funded, but only after Plaintiff submitted a whistleblower complaint to BEZMALINOVIC and HOLLRAH, and Plaintiff informed FARID, alleging that fraud and theft had been committed due to BEZMALINOVIC and HOLLRAH's failure to fund the Loans after the loan documents and Pledge Agreements had been signed by the Borrowers indicating that the funding had occurred on February 14, 2022 (the "Whistleblower Complaint"). In fact, in a Zoom meeting on August 4th, 2022, per DARIUS' question of the legality of the conduct, BEZMALINOVIC admitted to DARIUS and Plaintiff the illegal and unlawful nature of withholding funds on the loan to DEVON and JEREMY and his breach of duty to lender SME Partners, LLC, the Farid Grantor Trustor, and the Farshid Grantor Trust.

93.     On August 23, 2022, BEZMALINOVIC, who was still acting as Plaintiff's legal counsel, sent an email to Plaintiff that in return for Plaintiff obtaining a full release of any and all potential claims against the "Assemi family, family members, trustees, and family business entities and their managers," from DEVON and JEREMY, along with Plaintiff's release of any potential claims against MARICOPA and upon Plaintiff's immediate resignation as a manager,

officer, trustee, or director of any entities within the ASSEMI AFFILIATES: (1) $1,851,537 would be made available to Plaintiff by the end of the year; $500,000 would be made available to Plaintiff for the purpose of paying ELEVATED's unpaid employee salaries, claimed of cash distributions required to Plaintiff under existing Severance agreement; and, in direct contradiction of the agreed terms of Plaintiff's severance agreement with MARICOPA, $1,000,000 would be made available to Plaintiff in the event he was able to locate and acquire land within the Westlands Water District suitable for recharge (blocking Plaintiff's access to the existing parcel for recharge); (2) MARICOPA would contribute to ELEVATED the property identified as Kern County APNs 220-050-069-00-0, 220-050-49, and 220-050-12 that it had previously agreed to contribute under the terms of the Operating Agreement; (3) including MARICOPA ensuring ELEVATED water account would be established with Wheeler Ridge and, once the Kern county property transfers were complete, with 1,473.12 CAW (2.79 CAW per plantable acre) into this account, which MARICOPA had already agreed to contribute under the terms of the Operating Agreement; and (4) MARICOPA would obtain release of lien's of non-borrower trustor deed of trusts from Prudential in 120 days, by the end of 2022, thus usurping the promised $15 Million Prudential loan for ELEVATED, by MARICOPA substituting its own assets, agreed to as consideration for ELEVATED encumbering its land as non-borrower trustor under the $500 Million Prudential refinance, or else the lien would remain and ELEVATED's property held hostage indefinitely for no consideration. Plaintiff was given until 5:00 p.m. on August 26, 2022 to accept this "offer" contrary to his interests. Plaintiff rejected the "offer." In April of 2023, FARID at this point nearly bedridden from his ailment, informed Plaintiff that ASSEMI could nearly not pay its Semi-Annual loan payment if ELEVATED obtained its obligatory loan from Prudential, as ASSEMI could not pay down its $9 Million in debt to release ELEVATED's property and also pay Prudential. HOLLRAH had been hiding from KEVIN, as Trustee of the Farshid Grantor Trust and beneficiary of other trusts, equaling 2/3s of the farming assets, the insolvency of the operations.

94.     In making this "offer," BEZMALINOVIC, in his capacity as General Counsel

for ASSEMI and MARICOPA and as family counsel for the ASSEMI BROTHERS, violated Rule 1.7 Conflict of Interest in that he took an adverse position to Plaintiff, whom he represented in preparing the Operating Agreement for ELEVATED, and continued to personally represent as family counsel.

95.     On August 23, 2022, BEZMALINOVIC falsely and fraudulently notified Plaintiff that he would be removed by BEZMALINOVIC as Trustee of the Farshid Grantor Trust stating that the reason for Plaintiff's removal was to appoint an Independent Trustee to "decant" the Trust, however, Plaintiff's sister was appointed as successor Trustee and Plaintiff was removed as trustee because, as manager/owner of SME, he was protecting the Trust from the ongoing defrauding of DEVON and JEREMY in regard to the Loans.

96.     On December 1, 2022, in connection with Plaintiff upholding his fiduciary duty to the Farshid Grantor Trust and in violation of California Labor Code section 1102.5, the ASSEMI BROTHERS, unlawfully retaliated against Plaintiff as a MARICOPA employee, including refusing to indemnify him under California Labor Code Section 2802 for legal expenses incurred in litigation pertaining to his employment at MARICOPA related to litigation with Wonderful Pistachios. Further, after Plaintiff effectuated his Fiduciary duties to the Trust and SME by securing funding of the loans, per an email from BEZMALINOVIC dated August 23, 2022, MARICOPA (1) prevented any further distribution of the Severance funds to him, and (2) wrongly believing that Plaintiff had discovered fraudulent loan documents on MARICOPA's servers, cut off Plaintiff and ELEVATED's access to their email, data, network profiles, M-Files transaction software, and geographic information systems which were maintained on Maricopa's network, without notice.

97.     While awaiting the written Severance Agreement, and all payments and Severance Property derived from said Severance Agreement, Plaintiff was officially terminated as an employee of Maricopa in December 2022.

98.     As a direct and foreseeable result of MARICOPA's refusal to fund its capital contributions,   intentional   interference   with   contractual   relationships,   intentional

misrepresentation, and fraud in the inducement, ELEVATED continued to face significant liquidity issues. Rather than remedy the problem MARICOPA created, and allow ELEVATED to function, FARSHID and DARIUS called a meeting of ELEVATED, administered by CLARK, general Counsel for MARICOPA and who had also represented Plaintiff personally, on December 26, 2022 to (1) consider and vote on the removal of Plaintiff as a manager of the Company, (2) consider the appointment of one or more new managers of the Company, and (3) meet, confer, and vote on amendments to the Operating Agreement of the Company related to management changes, changes to the transfer restrictions on Membership Interests in Article V of the Operating Agreement, and related conforming amendments (which matter(s) constitute(s) a Major Decision under the Operating Agreement of the Company).

99.     Two days later, on or about December 28, 2022, notwithstanding that MARICOPA had not made its capital contributions in full to ELEVATED, MARICOPA, along with DEVON, JEREMY, and MALAKAN in an Action by Written Consent of the Members of ELEVATED ("Written Consent" a true and correct copy of which is attached hereto as Exhibit B) purportedly appointed FARSHID and MALAKAN as the "Managers" of ELEVATED, after purporting to remove Plaintiff as Manager, and further consenting to amending the Operating Agreement, by falsely and fraudulently indicating that MARICOPA, along with DEVON, JEREMY, and MALAKAN held a majority interest in ELEVATED. Said Written Consent unlawfully removed Plaintiff as Manager of ELEVATED, in breach of the fiduciary duties of MARICOPA, DEVON, JEREMY, and MALAKAN, as well as, FARSHID and MALAKAN, claiming in bad faith that MARICOPA held a 40% Membership Interest in ELEVATED, when in fact Maricopa held not more than approximately 25.3% Membership Interest in ELEVATED, and while ignoring the fact that Plaintiff had twice offered to purchase his prorate share of DEVON and JEREMY's interests and Section 9.3 of the Operating Agreement required the written consent of all Members to any amendment thereof.

100.    On or about December 28, 2022, MARICOPA, along with DEVON, JEREMY, and MALAKAN, also purported to amend the Operating Agreement, to allow the sale of a

"Percentage Interest" in ELEVATED with only a majority interest approving the sale, while again ignoring the fact that Section 9.3 of the Operating Agreement required the written consent of all Members to amend the Operating Agreement.

101.   Section 5.1 of the Operating Agreement provides, in relevant part, that "No member may transfer all or any portion of a Percentage Interest without the written consent of the other Members. The attempted transfer of all of any portion of a Percent Interest in violation of the Article shall be null and void. {emphasis supplied}." On or about December 28, 2022, MARICOPA purports to have purchased 100% of each of JEREMY and DEVON's Percentage Interest.  Plaintiff was not consulted, nor did he consent nor vote to approve these purported sales transactions, as such, these transactions are null and void.

102.   As a result of the ASSEMI BROTHERS and MARICOPA's refusal to pay the balance of the promised Severance, make in full the capital contributions to ELEVATED, the ASSEMI BROTHERS intentionally causing a delay in funding the Loans to DEVON and JEREMY for their capital contributions, and their blocking and interfering with a Prudential loan to ELEVATED, ELEVATED was unable to consummate a $40 million deal with an investor regarding a sale and lease back of certain citrus farmland in Kern County. The investor intended to pay for additional citrus improvements and lease the property to ELEVATED to operate. ELEVATED would have received the profits from the operations, access to reasonably priced water, and a share of the proceeds from the future sale of the land. At this meeting, as reflected by the minutes, MALAKAN and DARIUS provided that the intent of the parties taking control of ELEVATED was to pay bills, and within 60 days obtain $6Million in financing for ELEVATED to allow it to operate and that ownership would be transferred to Plaintiff 100%, which did not occur.

103.   On or about February 3, 2023, on information and belief, FARSHID and CLARK instructed Sherry Smiley, the head of Human Resources for ASSEMI to notify all of ELEVATED's employees that they were terminated effective February 10, 2023, notwithstanding that Plaintiff contacted Ms. Smiley regarding his good faith dispute with

1    MARICOPA over the control of ELEVATED and asked her to not move forward with any

2    terminations. Nonetheless, Ms. Smiley told ELEVATED's employees that they were to come to

3    the office, bring all their equipment including their laptops, their fobs used to access the restroom

4    and the office, etc., or else the police would be called.

5          104.    In May 2023, MALAKAN misappropriated ELEVATED's specialty trees,

6    growing using ELEVATED's proprietary methodology, and in theft of intellectual property,

7    breach of Loyalty and Due Care, and without paying the balance of his more than $600,000

8    capital contribution owed, planted such trees on his own property for his own financial benefit

9    using knowledge and methods obtained from being an owner in ELEVATED. The trees had been

10   paid for directly by Plaintiff. All requests for meetings and desire to pay for trees so that

11   ELEVATED could plant the trees itself were denied. Plaintiff sent MALAKAN a cease and

12   desist letter on May 17, 2023 to not misappropriate the trees. The response to the letter came not

13   from MALAKAN or his attorney but the Attorney for MARICOPA stating that though it did not

14   represent MALAKAN, that if Plaintiff made any further efforts to protect his interest with

15   claims, that KEVIN's interaction with his father would be cut off. This was while Plaintiff and

16   his sister Ashely Whelan were attempting to obtain an appointment with the top Neurological

17   expert in the world for Cerebral Ataxia at UCLA, and did obtain such appointment, in an attempt

18   to save his life or slow his rapid disability. Plaintiff plead with FARSHID, DARIUS and other

19   family members to not undermine his efforts to help his father. FARSHID denied that FARID

20   was this sick, and DARIUS showed contrition saying he did not even know about such action

21   by the attorney.

22         105.    In the Fall of 2023, it is believed that MARICOPA entered into an agreement for

23   sale of the Cawelo citrus farm to Prudential's Agriculture Equity Investment Group, which

24   includes 20 acres of trade secret trials which are the property of ELEVATED, and KEVIN was

25   to have a right of first refusal. Plaintiff in July of 2023, demanded from MARICOPA that

26   ELEVATED be compensated and that the 20 acres of intellectual property be retained by

27   ELEVATED.

28   ///

**Farm Credit Fraud**

86.     On or about June 30, 2023, Plaintiff learned that HOLLRAH, acting on behalf of MARICOPA, was attempting to close a loan with Farm Credit West ("AgWest") for approximately Thirteen Million Dollars, which MARICOPA and its affiliates intended to use to use to pay the first semi-annual loan payment on the Five Hundred Million Dollar ($500,000,000.00) Prudential Bank loan. The AgWest loan was falsely, fraudulently, and in violation of lending laws, misrepresented to Farm Credit West, in that it was represented MARICOPA owned a majority interest in ELEVATED, and, on information and belief, that FARSHID and MALAKAN were the managers of ELEVATED having signature authority. In fact, using MARICOPA's own valuation of the Basic School and Gardner parcels contributed to ELEVATED, it held at most only a 25.3 Percentage Interest in ELEVATED at the time, while Plaintiff held a majority interest, in a brazen attempt to misappropriate funds away from ELEVATED, while attempting to illegally encumber ELEVATED's land and other assets, all for the benefit of said Defendants.

87.     The AgWest loan took place while Plaintiff had been in good faith settlement negotiations with DARIUS and FARSHID , aided by Plaintiff's sister Ashely Whelan, to sell half of his interest in ELEVATED to the Munger family ("MUNGERS"), entering into an LOI for such sale, and seeking crop financing with Farm Credit in Bakersfield with the MUNGERS. DARIUS acknowledged the settlement by email in bad faith, delaying their official response for long enough to close on the fraudulent loan with Farm Credit so all Plaintiff's equity could be siphoned out, destroying the deal with the MUNGERS, and defrauding Plaintiff, the Farm Credit system, and also wronging the MUNGERS who had helped the ASSEMI family in their time of need when they needed assistance to process their pistachio pounds in 2019 when the dispute arose with Wonderful.

88.     On information and belief, in their attempt to obtain said approximately Thirteen Million Dollars loan from AgWest, MARICOPA, FARID and MALAKAN and certain of the DOE Defendants, and each of them, intentionally provided false and fraudulent information and

documentation to AgWest using electronic mail, with such false information claiming that FARSHID and MALAKAN were managers of ELEVATED with signatory authority, with the unlawful intent to misappropriate loan funds to be used for the benefit of MARICOPA and its affiliates (the "**SCHEME**"). These funds were needed because Defendants had run ASSEMI (which was already in special assets with U.S. Bank) and the ASSEMI AFFILIATES, including MARICOPA into the ground. In their own words, the Assemi empire was near bankruptcy, and the ASSEMI BROTHERS were simply trying to stay afloat.

89.     On or about June 30, 2023, FARSHID threatened Plaintiff by telephone stating that if he did not let the SCHEME go forward and allow the fraudulent AgWest loan to fund, he would sell ELEVATED's Assets, and that all of the family's business operations and the Trusts for Plaintiff and the other second generation members of the Assemi families, and would go bankrupt, and that he would not allow Plaintiff to ever see his father again.

90.     In an email on or about July 3, 2023, Plaintiff reported the SCHEME to AgWest and the Farm Credit Administration and the potential losses to the Farm Credit System arising from the attempt to defraud AgWest by MARICOPA, FARID and MALAKAN and certain of the DOE Defendants, and each of them.

91.     Had the SCHEME succeeded it would have resulted in the loss of money to ELEVATED and wrongfully encumbered title to ELEVATED's Assets.

92.     In perpetrating the SCHEME, MARICOPA, FARSHID and MALAKAN and certain of the DOE Defendants, and each of them, intended to use email communications to commit fraud against ELEVATED, Plaintiff and the System.

93.     On information and belief, MARICOPA, FARSHID and MALAKAN in perpetrating the SCHEME used interstate wire communications to commit the fraud.

94.     In 2023 and to date, Canopy Ag, LLC, owned by JEREMY and DEVON, still provided farm management and accounting services to ELEVATED at the direction of MARICOPA. Notwithstanding that MARICOPA then held only a 25.3 Percentage Interest in ELEVATED, on or about August 4, 2023, Plaintiff, after reviewing the ledger of Owner's

Contributions prepared by Canopy Ag, LLC, Plaintiff learned that, FARSHID, MARICOPA and certain of the DOE Defendants, intended to file a false and fraudulent Federal Income Tax Return on behalf of ELEVATED calculated on the fraudulent basis that MARICOPA holds a majority interest in ELEVATED. On information and belief, this fraudulent tax return was filed as part of FARSHID, MARICOPA and certain of the DOE Defendants ongoing plan and scheme to strip the equity from ELEVATED's Assets, based on MARICOPA's false contention that it had contributed ten million dollars ($10,000,000.00) in Capital Contributions to ELEVATED, falsely stating that a total of $8,053,140 in real property contributions (land and land with water), had been made by MARICOPA, before its purchase of DEVON and JEREMY's collective ten percent (10%) interests in ELEVATED, which purchase was done without the required consent of the Members in violation of the terms of the Operating Agreement. Plaintiff shared recorded documents proving that capital contributions of property were not made amounting to the claimed 40% ownership by MARICOPA as stated on its books and tax return, with DEVON, JEREMY, MARICOPA, FARSHID, and the accountants CliftonLarsonAllen. Plaintiff warned that electronically filing a tax return with this information would constitute tax and wire fraud and that mailing said false and fraudulent return would constitute tax and mail fraud. After this warning, the accountants CliftonLarsonAllen refused to sign or file the tax return and thereafter it was, on information and belief, electronically filed by employees of MARICOPA.

**The RICO Enterprise**

95.     For any Racketeer Influenced and Corrupt Organization action, it is important to distinguish between legitimate organizations, businesses and the abuse of those entities for illegal purposes by a corrupt "enterprise," which enterprise here, on information and belief was comprised of the ASSEMI BROTHERS, ASSEMI, MARICOPA and certain of the DOE Defendants, and each of them.

96.     The "pattern of racketeering activities" committed by the Defendants ASSEMI BROTHERS, ASSEMI and MARICOPA and certain of the DOE Defendants, and each of them, (the "RICO Defendants"), and the "Predicate Acts," loan, tax and wire fraud discussed herein

above, were done with the purpose of financial gain and were done within one year of the prior predicate act and continuing. (See 18 U.S.C. §1961.)

97.     By the acts alleged herein, the RICO Defendants, jointly and severally, have aided and abetted and conspired to violate 18 U.S.C. §1961 and et. seq. and other laws, through their ongoing "enterprise" as set forth below.

98.     The law presumes that a person intends the obvious results of their actions. Predicate Criminal Violations of Federal Wire Fraud Statute. 18 U.S.C. § 1343

99.     The RICO Defendants could be charged and convicted of multiple, related violations of law which form a pattern and which violations are each potentially punishable by more than one year in jail.

100.     Defendants acted in criminal violation of the federal wire fraud statute under 18 U.S.C. 1343.18 U.S.C. § 1343 which provides:

> Whoever, having *devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses*, representations, or promises, *transmits or causes to be transmitted by means of wire*, radio, or television communication in interstate or foreign commerce*, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice*, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both (emphasis added).

101.     The RICO Defendants devised or intended to devise a scheme or artifice meant to defraud and/or to obtain money or property from illicit and illegal activities affecting a financial institution.

102.     The RICO Defendants utilized false or fraudulent pretenses, representations, and/or promises in order to defraud and/or obtain money from illicit and illegal activities.

103.    On information and belief, in order to achieve or attempt to achieve the fraud described in the preceding paragraphs, the RICO Defendants sent correspondence and other documents that were delivered by wire and/or by the U.S. Postal Service to AgWest.

104.    On information and belief, Defendants transmitted or caused to be transmitted by means of wire for the purpose of executing such scheme or artifice when they transmitted telephone and cellular telephone calls, documents, facsimiles, emails, instant messages, and any other form of communication to AgWest.

105.    Violation of 18 U.S.C. § 1341 is felony punishable by not more than 30 years of imprisonment or a fine of $1,000,000 USD, or both.

106.    Plaintiff alleges that the RICO Defendants' conduct constitutes racketeering as set forth in 18 U.S.C. § 1964(c).  Specifically, Congress has defined "racketeering" to include committing fraud by means of electronic transmissions over wire and by mail.

107.    Defendant and certain of the DOE Defendants caused injury to ELEVATED's business and property by engaging in a pattern of racketeering activity connected with an enterprise that affects interstate commerce. (Gervase v. Superior Court (1995) 31 Cal.App.4th 1218, 1231.)

108.    The RICO statute provides, in pertinent part, that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." (18 U.S.C. § 1964(c).)

**Predicate Criminal Acts of False Statements**

109.    The RICO Defendants could be charged and convicted of violations of law for loan and wire fraud which form a pattern and practice and which violations are each potentially punishable by more than one year in jail. In addition to loan and wire and/or mail fraud, on information and belief, the RICO Defendants made false statements to officials of the U.S. Government in violation of 18 U.S.C. §1001. This statute provides:

> (a) except as otherwise provided in this section, whoever, in any manner within the jurisdiction of the executive, legislative, or judicial branch of the Government of

the United States, knowingly and willfully - (1) falsifies, conceals, or covers up by any trick scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) *makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement* or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both [emphasis supplied]

110.   Knowingly submitting false and fabricated tax documents constitutes false statements to officials of the U.S. Government in violation of 18 U.S.C. §1001 and constitutes a predicate offense.

### First Cause of Action (Direct)
### Fraud In The Inducement
### (Against Defendants MALAKAN INVESTMENTS, DEVON, JEREMY and

111.   Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 of this Amended Complaint above, as though fully alleged herein.

112.   Upon execution of the Operating Agreement, Defendants MALAKAN INVESTMENTS, DEVON, JEREMY and MARICOPA made representations to Plaintiff that they would adhere to the terms and conditions of the agreement and that they would timely make certain capital contributions to ELEVATED.

113.   The representations by said Defendants were completely false. Further, said Defendants, and each of them knew their representations were false at the time they were made to Plaintiff. The true facts were that Defendants intended to induce Plaintiff to enter into the agreement and, on information and belief, as part of a plan to defraud Plaintiff and steal his majority interest in ELEVATED.

114.   Defendant's false representations induced Plaintiff to enter into the Operating Agreement in reasonable reliance thereon.

115.   As a proximate result of the false representations made by said Defendants, and each of them, Plaintiff has suffered extensive damages, in that the false statement induced Plaintiff to enter into the Operating Agreement, resulting in ELEVATED being unable to meet

its financial obligations, suffering damages and diminishing the value of Plaintiff's interest therein, in an amount to be proven at the time of trial, not fully known at this time but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Second Cause of Action** **(Derivative)**
**Intentional Interference with Prospective Economic Advantage**
**(Against Defendants ASSEMI BROTEHRS, MALAKA INVESTMENTS,**
**MARICOPA, MALAKAN, BEZMALINOVIC, CLARK and HOLLRAH)**

116.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 of this Complaint above, as though fully alleged herein.

117.    ELEVATED had an economic relationship between itself and the owners of the 1,659.45-acre Giumarra property located in Edison, California, and prospective farming tenants for the property, with the high probability of future economic benefit to ELEVATED.

118.    Defendants MALAKAN INVESTMENTS, MARICOPA, MALAKAN, BEZMALINOVIC, HOLLRAH and the ASSEMI BROTHERS, were aware of ELEVATED's economic relations with the owners of the 1,659.45-acre Giumarra property and the prospective farming tenants for the property, and with the probability of future economic benefit to ELEVATED.

119.    Said Defendants undertook intentionally wrongful acts designed to disrupt the economic relationship between ELEVATED and owners of the 1,659.45-acre Giumarra property and the prospective farming tenants for the property.

120.    Said intentionally wrongful acts by said Defendants proximately caused the actual disruption of the relationship economic relationship between Plaintiff and the owners of the 1,659.45-acre Giumarra property and with the prospective farming tenants for the property.

121.    ELEVATED entered into the Nursery Deal in December 2021. Said intentionally wrongful acts by MARICOPA were designed to disrupt the NURSERY Deal.

122.    Said intentionally wrongful acts by Defendant MARICOPA proximately caused the actual disruption of the Nursery Deal.

123.     Plaintiff has suffered economic harm proximately caused by the acts of said Defendants, in an amount to be proven at the time of trial, not fully known at this time but not less than the sum of Fifteen Million Dollars.

WHEREFORE, Plaintiff prays for relief as set forth below.

### Third Cause Of Action (Direct)
### Breach of Contract - (Failure to Make Contributions)
### (Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY)

124.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 of this Complaint above, as though fully alleged herein.

125.     Under the Operating Agreement, a true and correct copy of which is attached hereto as Exhibit A and incorporated herein by reference as through fully set forth, Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON, and JEREMY committed to contributing assets to ELEVATED in return for their respective Percentage Interests in ELEVATED.

126.     Plaintiff performed all, or substantially all, of the significant things that the Operating Agreement required him to do. Any failure of performance by Plaintiff has been waived and excused by said Defendants, and each of them, materially breaching the Operating Agreement.

127.     Said Defendants, and each of them, breached the Operating Agreement by failing to make the required contributions, including, but not limited to, MARICOPA's failure to contribute the real property and water rights that it had promised to contribute in return for a forty percent interest (40%) in ELEVATED.

128.     As a result of said Defendants, and each of them, material breaches of the Operating Agreement, Plaintiff has been damaged, in an amount to be proven at the time of trial, not fully known at this time, but not less than the sum of Fifteen Million Dollars.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Fourth Cause Of Action** (Direct)
**Breach of Contract - (Failure to Make Additional Capital Contributions)**
**Plaintiff Against Defendants MARICOPA, DEVON, JEREMY and**
**MALAKAN INVESTMENTS**

129.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 of this Complaint above, as though fully alleged herein.

130.     Plaintiff performed all, or substantially all, of the significant things that the Operating Agreement required him to do. Any failure of performance by Plaintiff has been waived and excused by Defendants MARICOPA, DEVON, JEREMY and MALAKAN INVESTMENTS' material breaches of the Operating Agreement.

131.     Defendants     MARICOPA,     DEVON,     JEREMY     and     MALAKAN INVESTMENTS breached the Operating Agreement by failing to make the additional capital contributions required after a capital call had been made in conformity with the terms of the Operating Agreement.

132.     As a result of the breaches by Defendants MARICOPA, DEVON, JEREMY and MALAKAN INVESTMENTS, Plaintiff has been damaged in an amount to be proven at the time of trial, not fully known at this time, but not less than the sum of Fifteen Million Dollars.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Fifth Cause Of Action** (Direct)
**Breach of Contract - (Failure to Comply with Contract Terms in Purchase of Minority**
**Member Interest) Plaintiff Against Defendants MARICOPA, DEVON and JEREMY**

133.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 of this Complaint above, as though fully alleged herein.

134.     Plaintiff has performed all, or substantially all, of the significant things that the Operating Agreement required him to do. Any failure of performance by Plaintiff has been waived and excused by Defendant MARICOPA, DEVON and JEREMY's material breaches of the Operating Agreement.

135.    Defendant MARICOPA materially breached Section 5.1 of the Operating Agreement by failing to obtain the written consent of the other Members, including Plaintiff, prior to purchasing the minority Membership Interests of DEVON and JEREMY, and not by failing to allow Plaintiff the opportunity to purchase a pro rata share of such interests, as required under section 5.1 of the Operating Agreement.

136.    As a result of the breach by Defendant MARICOPA, Plaintiff has been damaged, by not receiving the opportunity to purchase a pro rata share of such interests, entitling Plaintiff to damages, in an amount to be proven at the time of trial, not fully known at this time, but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Sixth Cause Of Action** (Derivative)
**Breach of the Obligation of Good Faith and Fair Dealing**
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY)**

137.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 of this Complaint above, as though fully alleged herein.

138.    As Members of ELEVATED, MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY owed a duty of care to Plaintiff and ELEVATED under Corp. Code §17704.09(d), which requires that a member shall discharge the duties to a limited liability company and the other members with the obligation of good faith and fair dealing.

139.    MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY breached the obligation of good faith and fair dealing in that they:

(a)    Aided and abetted in the commission of attempted wire fraud against AgWest by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain a loan from AgWest under false pretenses; and
(b)    Wrongly attempted to encumber property owned by ELEVATED by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain a loan from AgWest under false pretenses.
(c)    Wrongly attempted to commit the theft of funds intended for ELEVATED for purposes unrelated to ELEVATED.
(d)    Conspired to unlawfully take all of Plaintiff's equity in ELEVATED

140.    ELEVATED suffered damages proximately caused by said Defendants breaches of the obligation of good faith and fair dealing, in an amount to be proven at the time of trial, not

fully known at this time, but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**<u>Seventh Cause Of Action</u> (Direct)**
**Breach of the Duty of Care**
**(Against Defendants FARSHID and MALAKAN)**

141.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110. As the purported Managers of ELEVATED, FARSHID and MALAKAN owed a duty of care to Plaintiff and ELEVATED under Corp. Code §17704.09(c), which requires that a member refrain from engaging in (1) grossly negligent or reckless conduct; (2) intentional misconduct; and (3) any knowing violation of the law, in its activities with the LLC.

143.     FARSHID and MALAKAN committed intentional misconduct in that they:

(a)     Aided and abetted in the commission of attempted wire fraud against AgWest by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain  a loan from AgWest under false pretenses; and
(b)     Wrongly attempted to encumber property owned by ELEVATED by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain  a loan from AgWest under false pretenses.
(c)     Wrongly attempted to commit the theft of funds intended for ELEVATED for purpures unrelated to ELEVATED.
(d)     Conspired to unlawfully take all of Plaintiff's equity in ELEVATED.

144.     Plaintiff suffered damages proximately caused by the intentional misconduct of said Defendants in an amount to be proven at the time of trial, not fully known at this time, but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**<u>Eighth Cause of Action</u> (Derivative)**

**Acquisition and Maintenance of an Interest in and Control of an Enterprise**
**Engaged in a Pattern of Racketeering Activity; 18 U.S.C. §§ 1961(5), 1962(b) RICO**
**(Against Defendants ASSEMI BROTHERS, HOLLRAH, MARICOPA and DOE**
**Defendants 1- 20)**

145.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 of this Complaint above, as though fully alleged herein.

146.     During the three (3) years preceding December 1, 2023, said Defendants did cooperate jointly and severally in the commission of three (3) or more RICO predicate acts

that are itemized in the RICO laws at 18 U.S.C. §§1961(1)(B), and did so in violation of the RICO law at 18 U.S.C. § 1962(b) ("**prohibited activities**").

147.   Said Defendants are each "**persons**" within the meaning of the RICO.

148.   Said Defendants operate as an "enterprise" within the meaning of RICO, the activities of which affect interstate commerce through the use of wire transmissions.

149.   By virtue of the predicate acts described in this Complaint, including without limitations: engaging in monetary transactions improperly derived from unlawful activity, Said Defendants transferred, received, furthered and supplied financing and income that was derived, both directly and indirectly, from a pattern of racketeering activity in which each of them participated as a principal and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing, operating and furthering illegal enterprises in violation of 18 U.S.C. §1962(a).

150.   As a direct and proximate result of said Defendants' violation of 18 U.S.C. §1962(a), ELEVATED suffered the loss of valuable property, financial services and support, and suffered other business and pecuniary damages.

151.   Plaintiff further alleges that all Defendants did commit three (3) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. §1962(b) supra.

152. 18 U.S.C. § 1964(c) defines "racketeering activity" as follows:

(1) "racketeering activity" means

(A) any act or threat involving... bribery, extortion... which is chargeable under State law and punishable by imprisonment for more than one year;

(B) any act which is indictable under any of the following provisions of title 18,... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the

obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant),... section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering),... section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity),... section 1960 (relating to illegal money transmitters),

153.    Plaintiff demands that judgment be entered against said Defendants, and each and every one of them, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Ninth Cause Of Action** (Derivative)
**Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c) (Against Defendants ASSEMI BROTHERS, MARICOPA, HOLLRAH  and DOE Defendants 1-20**

154.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein, and specifically repeats and re-alleges the allegations under the Eighth Cause of Action concerning RICO liability.

155.    Said Defendants did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect interstate commerce.

156.    Likewise, said Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

157.    During the three (3) years preceding December 1, 2023, said Defendants did cooperate jointly and severally in the commission of three (3) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(B) and did so in violation of the

RICO law at 18 U.S.C. § 1962(c) ("prohibited activities").

158.    Plaintiff further alleges that said Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. § 1962(c) supra.

159.    Plaintiff demands that judgment be entered against said Defendants, each and every one of them, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>Tenth Cause of Action</u>  (Derivative)
**Conspiracy to Engage  in a Pattern of Racketeering Activity; 18 U.S.C. §§ 1961(5), 1962(d) (Against ASSEMI BROTHERS, MARICOPA, HOLLRAH  and DOE Defendants 1-20**

160.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein, and specifically repeats and re-alleges the allegations under the Eighth and Ninth Causes of Action concerning RICO liability.

161.    Said Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

162.    During the three (3) calendar years preceding December 1, 2023, and beyond, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(B), in violation of 18 U.S.C. § 1962(d).

163.    Plaintiffs further alleges that said Defendants did commit three (3) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(d) ("prohibited activities").

164.    Plaintiff demands that judgment be entered against said Defendants, and each and every one of them, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Eleventh Cause Of Action (Direct)**
**(Unfair Business Practices)**
**(Against Defendants MALAKAN and FASHID)**

165.    Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

166.    By reason of Defendants MALAKAN and FASHID's fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, which on information and belief was ratified by the other Defendants, and each of them, and which on information and belief, the cost of which was passed on to the Nominal Defendant by artifice. Said Defendants have violated California Business and Professions Code section 17200 et seq. by consummating an unlawful, unfair, and fraudulent business practices, designed to deprive Plaintiff of the benefits of his Percentage Interest in Elevated.

167.    By reason of the foregoing, Plaintiff has suffered deprivation of property in the dilution of his Percentage Interest in ELEVATED and money in the form of distributions not received as a result of the unlawful, unfair, and fraudulent business practices and Plaintiff continues to suffer damages in a sum which is, as yet unascertained. Plaintiff will ask leave of court to amend this Complaint when the true nature and extent of his damages have been ascertained.

WHEREFORE, Plaintiff prays for relief as set forth below.

///

///

///

///

///

**Twelfth Cause of Action** (Derivative)
**Breach of Fiduciary Duty**
**(Against Defendants FARSHID and MALAKAN)**

168.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

169.    Defendants FARSHID and MALAKAN were and are required to use their abilities to control and manage ELEVATED in a fair, just, and equitable manner in order to ensure that ELEVATED complied with applicable laws and its contractual obligations, to refrain from abusing their positions of control, and not to favor their own interests at the expense of ELEVATED and its Members. Defendants violated their fiduciary duties to ELEVATED, including, without limitation, their duties of care, good faith, honesty, and loyalty.

170.    The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to Defendants' gross mismanagement, bad faith and/or reckless disregard of the rights and interests of ELEVATED and its Members and for acting without the reasonable and ordinary care which they owed to ELEVATED and its Members.

171.    As a result of the foregoing, said Defendants have participated in harming ELEVATED and have breached fiduciary duties owed to Nominal Defendant. Said Defendants knowingly participated in each of the alleged breaches of their fiduciary duties.

172.    By reason of the foregoing, Nominal Defendant has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Thirteenth Cause Of Action** (Derivative)
**Abuse Of Control And Gross Management**
**(Against Defendants FARSHID and MALAKAN)**

173.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

174.    By virtue of their illicit conduct, Defendants FARSHID and MALAKAN exercised control over the Company and its operations, and owed duties as controlling persons

to ELEVATED not to use their positions of control within the company for their own personal interests and contrary to the interests of ELEVATED or to take actions contrary to law for their own benefit to the determinant of ELEVATED.

175.   Defendants FARSHID and MALAKAN's conduct amounts to an abuse of their control and gross mismanagement of ELEVATED, in violation of their fiduciary obligations to the company. Said Defendants knowingly participated in their abuse of control, and on information and belief, unlawful conduct, whether expressly or by ratification, and grossly mismanaged the company in violation of their fiduciary duties.

176.   As a result of said Defendants' abuse of control and gross mismanagement, ELEVATED has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Fourteenth Cause of Action** (Derivative)
**Corporate Waste**
**(Against Defendants FARSHID and MALAKAN)**

177.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

178.   As alleged in detail hereinabove, Defendant FARSHID and MALAKAN had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of ELEVATED and in the use and preservation of its property and assets, and the highest obligation of fair dealings. Defendants wasted corporate assets, diverted corporate assets for improper corporate purposes, including, but not limited to encumbering assets in order to obtain financing for an unrelated enterprise for the benefit of said Defendants, instead of using those corporate assets for their intended purpose, and on information and belief, wasted ELEVATED's assets in pursuit of unlawful conduct, whether expressly or by ratification, for said Defendants monetary benefit, all to the detriment of Nominal Defendant.

179.   By reason of the foregoing, Nominal Defendant has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WHEREFORE, Plaintiff prays for relief as set forth below.

**Fifteenth Cause of Action (Derivative)**
**Unjust Enrichment**
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY)**

180.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

181.    Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY derived opportunities and other benefits from ELEVATED and were otherwise unjustly enriched during the time in which the wrongful practices, and on information and belief, unlawful conduct, either expressly or by ratification, occurred, to the detriment of ELEVATED. Said Defendants profited by engaging in the wrongful conduct set forth in the Complaint above, including, but not limited to wrongfully converting funds, property and opportunities rightfully belonging to ELEVATED, and on information and belief, unlawful conduct.

182.    Said Defendants enrichment is directly and causally related to the detriment of ELEVATED. These benefits were accepted by Defendants, and each of them, under such circumstances that it would be inequitable for it to be retained without payment. As alleged above, Defendants breached their fiduciary duties and/or abused their positions of control and are not justified in retaining the benefits conferred upon them.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Sixteenth Cause Of Action (Direct)**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY)**

183.    Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

184.    California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California

185.    As a result of the actions of Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY, and each of them, set forth hereinabove, said Defendants have violated the implied covenant of good faith and fair dealing contained in the contract between Plaintiff and Defendants, and each of them, as against Plaintiff, and as a result thereof, Plaintiff is entitled to damages as prayed not less than the jurisdictional limit of this Court.

186.    The actions of said Defendants, as hereinbefore described, in violation of said implied covenant of good faith and fair dealing have caused Plaintiff to suffer damages according to proof at trial.

**Seventeenth Cause Of Action** (Direct) (Accounting)
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY and Nominal Defendant)**

187.    Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

188.    As fiduciaries, by virtue of said Defendants asserting that they hold the controlling interest in Nominal Defendant, said Defendants have a duty to account to Plaintiff. As such, Plaintiff is entitled to a detailed accounting by said Defendants and the Nominal Defendant.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Eighteenth Cause Of Action** (Direct)
**(Unjust Enrichment)**
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY)**

189.    Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

190.    Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY have been unjustly enriched by their wrongful conduct as alleged herein and are liable to Plaintiff whether by restitution or quasi-contract.

191.     As a direct and proximate result of said Defendants' unjust enrichment, and each of them, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial, but greater than the jurisdictional amount of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Nineteenth Cause of Action** (Direct)
**Negligent Misrepresentation**
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, BEZMALINOVIC DEVON and JEREMY)**

192.     Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

193.     Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY have been unjustly enriched by their wrongful conduct as alleged herein and are liable to Plaintiff whether by restitution or quasi-contract.

194.     As a direct and proximate result of said Defendants' unjust enrichment, and each of them, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial, but greater than the jurisdictional amount of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Twentieth Cause of Action** (Direct)
**Misappropriation/Conversion**
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY)**

196.     Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

197. Said Defendants have misappropriated and converted ELEVATED's funds, and property for Defendants' use and benefit. The amounts of the funds misappropriated can only be determined by documents currently in Defendants' possession.

198. As a direct and proximate result of Defendants misappropriation and conversion, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Twenty-First Cause Of Action** (Direct)
**Breach of the Obligation of Good Faith and Fair Dealing**
**(Against Defendants MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY)**

199.     Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

200.     As Members of ELEVATED, MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY owed a duty of care to Plaintiff and Nominal Defendant under Corp. Code §17704.09(d), which requires that a Member shall discharge the duties to a limited liability company and the other members with the obligation of good faith and fair dealing.

201. MARICOPA, MALAKAN INVESTMENTS, DEVON and JEREMY breached the obligation of good faith and fair dealing in that they:

(a)     Aided and abetted in the commission of attempted wire fraud against AgWest by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain a loan from AgWest under false pretenses; and

(b)     Wrongly attempted to encumber property owned by ELEVATED by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain a loan from AgWest under false pretenses.

202.     Plaintiff and Nominal Defendant suffered damages proximately caused by the breached the obligation of good faith and fair dealing of said Defendants in an amount to be proven at the time of trial, not fully known at this time, but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Twenty-Second Cause Of Action** (Direct)
**Breach of the Duty of Care**
**(Against Defendants FARSHID and MALAKAN)**

203.     As Managers of ELEVATED, FARSHID and MALAKAN owed a duty of care to Plaintiff and ELEVATED under Corp. Code §17704.09(c), which requires that a member refrain from engaging in (1) grossly negligent or reckless conduct; (2) intentional misconduct; and (3) any knowing violation of the law, in its activities with the LLC.

204.     FARSHID and MALAKAN committed intentional misconduct in that they:

(a)      Aided and abetted in the commission of attempted wire fraud against AgWest by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain a loan from AgWest under false pretenses; and

(b)      Wrongly attempted to encumber property owned by ELEVATED by knowingly mispresenting the majority ownership of ELEVATED in an attempt to obtain a loan from AgWest under false pretenses.

205.  Plaintiff suffered damages proximately caused by the intentional misconduct of said Defendants in an amount to be proven at the time of trial, not fully known at this time, but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Twenty-Third Cause of Action**  (Direct)
**Wrongful Termination in Violation of Public Policy**
**(Against Defendants ASSEMI, MARICOPA, FARID and BEZMALINOVIC )**

206.      Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs 1 through 110, as though fully set forth herein.

207.      Under California law, it is unlawful for an employer to terminate an employee in violation of a fundamental public policy of the United States of America and/or the State of California.

208.      Upon information and belief, in failing to memorialize Plaintiff's Servance Agreement which the parties agreed would, upon execution by the parties, end Plaintiff's employment relationship with said Defendants, thereby, within two years last past, constructively terminating Plaintiff by not following Defendants' agreement with Plaintiff.

209.      As alleged herein, MARICOPA's decision to terminate Plaintiff was substantially motivated by Plaintiff's protected status as a whistleblower pursuant to California law and Labor Code. Plaintiff is informed and believes that MARICOPA's managing agents made the decision to terminate the Plaintiff and that BEZMALINOVIC ratified their decision.

210.      As a direct and proximate result of the violation of Plaintiff's rights under California law, Plaintiff has sustained and continues to sustain substantial losses of earnings and employment benefits including sums accrued and owed pursuant to the Severance Agreement.

211.     As a proximate result of the violation of Plaintiff's rights under California law, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to his damage in a sum according to proof at trial.

212.     Defendant MARICOPA committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Plaintiff is thus entitled to punitive damages from said Defendants in an amount according to proof at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Twenty-Fourth Cause of Action (Direct)**
**Retaliation in Violation of California Labor Code Section 1102.5**
**(As to Defendants MARICOPA, ASSEMI BROTHERS, BEZMALI☐OVIC and HOLLRAH)**

213.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 110 and 207 through 212, as though fully set forth herein.

214.     Labor Code Section 1102.5 provides in pertinent part that it is an unlawful practice for an employer to terminate an employee for reporting or threatening to report a violation of a California or Federal statute.

215.     Defendant MARICOPA is an employer covered by Labor Code Section 1102.5.

216.     Plaintiff was an employee protected under Labor Code Section 1102.5.

217.     Plaintiff approached FARID, BEZMALINOVIC and HOLLRAH regarding the failure to fund the Loans and in regard to illegally withholding the Loan funds which constituted a violation of numerous laws, including, but not limited to, California Penal Code §487.

218.     Defendant MARICOPA terminated Plaintiff in anticipation of Plaintiff's reporting said statutory violations.

219.     Plaintiff's notification to FARID, BEZMALINOVIC and HOLLRAH of said statutory violations resulted in Defendant MARICOPA's decision to terminate Plaintiff.

1    220.    Plaintiff was harmed.

2    221.    Defendant MARICOPA's retaliatory conduct was a substantial factor in causing

3    Plaintiff's harm.

4    222.    As an actual and proximate result of Defendants' actions, and each of them,

5    Plaintiff has suffered and continues to suffer damages in the form of lost wages, earnings, and

6    other economic benefits, the exact amount of which will be proven at trial.

7    223.    In addition, Plaintiff has suffered and continues to suffer emotional distress as

8    an actual and proximate result of Plaintiff's conduct as herein described, suffering and

9    continuing to suffer mental distress and mental anguish, reacting with humiliation,

10    embarrassment, anger, outrage, disappointment, and worry, all of which is substantial and

11    enduring and according to proof.

12    224.    Defendant MARICOPA and its agents above-recited actions were done with

13    malice, fraud, and/or oppression, and in reckless disregard of Plaintiff's rights under Labor Code

14    Section 1102.5, justifying an award of compensatory, general, exemplary and punitive damages

15    (See *Mathews v. Happy Valley Conf. Ctr., Inc.* (2019) 43 Cal.App.5th 236, 267,) and an award

16    of reasonable attorney's fees for violation of section 1102.5(b).)

17    WHEREFORE, Plaintiff prays for relief as set forth below.

18    **Twenty-Fifth Cause of Action** (Derivative)
**Misappropriation/Conversion**

19    **(Against Defendants ASSEMI BROTHERS, MARICOPA, MALAKAN
INVESTMENTS, DEVON and JEREMY)**

20    225.    Plaintiff hereby incorporates by reference the foregoing allegations as if

21    fully rewritten.

22    226.    Defendants have intentionally used Nominal Defendant's property

23    without authority to so use it, for said Defendants use and benefit. The extent of such misuse

24    can be only determined by documents currently in said Defendants' possession.

25    227.    As a direct and proximate result of Defendants misuse of property, Plaintiff has

26    suffered, and will continue to suffer, damages in an amount to be determined at trial.

27    WHEREFORE, Plaintiff prays for relief as set forth below.

28

**Twenty-Six Cause of Action** (Direct)
**Civil Extortion**
**(Against Defendants BEZMALINOVIC and FARSHID)**

228.     Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

229.     Said Defendants knew their threats and intimidation were wrongful.

230.     Said Defendants' threat and intimidation included a demand for property.

231.     As a result of such threats and intimidation, Plaintiff complied with said demands thereby allowing said Defendants to encumber property to which Defendants had no possessory or ownership rights.

322.     As a direct and proximate result of Defendants' threats and intimidation, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Twenty-Seventh Cause of Action**
**(Direct)**
**Breach of Contract – (Failure to Pay in Full Severence)**
**(Against Defendant MARICOPA)**

233.     Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten.

234.     Plaintiff performed all, or substantially all, of the significant things that the Severance Agreement required him to do in return for receipt of the promised Severance payment. Any failure of performance by Plaintiff has been waived and excused by Defendant MARICOPA's material breach of said agreement.

235.     Defendant MARICOPA breached the Severance Agreement by failing to make the full Severance payment in conformity with the terms of the  Severance Agreement.

236. As a result of the breach of the Severance Agreement by Defendant MARICOPA, Plaintiff has been damaged, in an amount to be proven at the time of trial, not fully known at this time, but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

1

**Twenty-Eighth Cause of Action** (Direct)
**Misappropriation of Trade Secrets**
**(Against Defendant MARICOPA)**

2

3      237. Plaintiff hereby incorporates by reference the foregoing allegations as if fully

4      rewritten.

5      238. Plaintiff made a substantial investment of time, effort and money in the development

6      of the internal version of the following: M-Files, Analytics systems, Geographic Information

7      System (GIS), and the data, sources, and data structure for each and connecting all technology

8      and ERP systems in ASSEMI and ASSEMI AFFIALIATES ("M-Files") system thereby

9      creating a protectable property right.

10      239. Defendants MARICOPA, ASSEMI and Granville Homes. Inc. misappropriated the

11      "M-Files" at no cost;

12      240. Plaintiff has the right and standing to bring this action against MARICOPA for such

13      misappropriation pursuant to the Uniform Trade Secrets Act (Civ. Code § § 3426-3426.11).

14      241. Defendants MARICOPA, ASSEMI and Granville Homes, Inc. have injured

15      Plaintiff by the misappropriation of the M-1 Files system, in an amount to be proven at the time

16      of trial, not fully known at this time, but not less than the jurisdictional limit of this Court.

17      WHEREFORE, Plaintiff prays for relief as set forth below.

18

**Twenty-Ninth Cause of Action** (Direct)
**Declaration of Rights**

19

**(Against Defendant MARICOPA, FARSHID and MALAKAN)**

20      242.   Plaintiff hereby incorporates by reference the foregoing allegations as if

21      fully rewritten herein.

22      243.   There exists a dispute between Plaintiff and said Defendant as to their rights,

23      obligations, status, and legal relations in regard to ELEVATED and in particular as to who has

24      the controlling interest in ELEVATED and who presently holds the position and power to act

25      as the Manager of ELEVATED.

26      244.   Plaintiff is entitled to a declaration of the rights, obligations, status, and legal

27      relations of the parties.

28

WHEREFORE, Plaintiff prays for relief as set forth below.

**Thirtieth Cause of Action** (Direct)
**Malpractice**
**(Against Defendants BEZMALINOVIC and CLARK )**

245.    Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten herein.

246.    Defendants BEZMALINOVIC and CLARK and failed to use reasonable skill and care in the representation of Plaintiff by violating numerous rules of professional conduct, taking adverse positions to Plaintiff, a current client, which damaged Plaintiff.

247.    As a direct and proximate result of the negligence and carelessness of said Defendants, Plaintiff was damaged in an amount to be proven at the time of trial, not fully known at this time, but not less than the jurisdictional limit of this Court.

WHEREFORE, Plaintiff prays for relief as set forth below.

**Thirty-first Cause of Action** (Direct)
**CONSTRUCTIVE TRUST**
**(Against Defendants MARICOPA and ASSEMI)**

248.    Plaintiff hereby incorporates by reference the foregoing allegations as if fully rewritten herein.

249.    Plaintiff relied on the written agreement with MARICOPA that it would make the contribution of real property and water rights to ELEVATED, and in reasonable reliance Plaintiff performed his obligations under said agreement.

250.    The contract was just and reasonable as to said Defendants and the consideration provided to said Defendants was adequate, thus, Defendants had a duty to perform  their conditions under the contract.

251.    Plaintiff has performed all conditions required to be performed under the agreement.

252.    Money damages are inadequate to compensate Plaintiff in that that subject real property and attendant water rights are unique.

253.    Defendants are stopped from relying on the statute of frauds because failure to enforce the contract would result in both an unconscionable injury to the Plaintiff and the unjust enrichment of the Defendants.

WHEREFORE, Plaintiff prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    A declaration of the rights, obligations, status, and legal relations of the parties, including, but limited to, a declaration that Plaintiff is the majority owner of ELEVATED;

2.    For general damages, according to proof at the time of trial;

3.    For special damages according to proof at the time of trial;

4.    For punitive and/or exemplary damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct Plaintiff, not including the trebled damages for the RICO causes of action, against Defendants, each and every one of them jointly and severally;

5.    For trebled damages for each of the RICO causes of action;

6.    That the Court adjudge and decree that Defendant's actions violated section 17200, et seq. of the Business & Professions Code;

7.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from taking any action that would encumber any of ELEVATED's Assets, that would create any additional debt obligation of ELEVATED, taking or using any proceeds from the sale of ELVATED crops, using any of ELEVATED funds for other than payment of

ELEVATED's obligations or that would in any manner impair or detrimentally impact Plaintiff's Membership or Percentage Interest in ELEVATED.

8.      For a declaration and judgment of the Court imposing a constructive trust on the real property and attendant water rights of said Defendants and declaring that Plaintiff is the beneficiary of such real property and water rights, and that the Defendants hold such real property and water rights for the Plaintiff's benefit.

Dated: March 6, 2024                              **CREEDE-BLYTH LAW, APC**

By: _____
     Stan D. Blyth
     Zena M. Sin
     Attorneys for Plaintiff Kevin Assemi

**<u>Exhibit A</u>**
**Operating Agreement of Elevated Ag, LLC**
**(Attached)**

Complaint for Damages and Injunctive Relief

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

# OPERATING AGREEMENT
## OF
## ELEVATED AG, LLC

This Operating Agreement of Elevated Ag, LLC (the "Agreement") is made effective September 16, 2020 (the "Effective Date") by Kevin Assemi ("Kevin"), Jeremy A. Yurosek, Trustee of the Jeremy J. Yurosek Trust, Dated December 26, 2008 ("Jeremy"), Devon Yurosek and Jeffrey Yurosek, Trustees of the Devon J. Yurosek Trust, Dated December 26, 2008 ("Devon"), Malakan Investments, LLC, a California limited liability company ("Malakan"), and Maricopa Orchards, LLC, a California limited liability company ("Maricopa") (hereinafter referred to individually as a "Member" and collectively as the "Members"). Capitalized words that are not defined in the body of this Agreement are defined in Article X.

## AGREEMENT:

In consideration of the mutual representations, warranties, covenants and representations contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## FORMATION AND NAME; OFFICE; PURPOSE; TERM

1.1     Organization.  The Members hereby organize a limited liability company (the "Company") pursuant to the California Revised Uniform Limited Liability Company Act (California Corporations Code 17701.01 et seq.) as amended from time to time (including any corresponding provisions of succeeding law) (the "Act") and this Agreement.  The Members caused Articles of Organization to be prepared, executed, and filed with the California Secretary of State as of September 15, 2020.

1.2     Company Name and Principal Place of Business.  The Company's name is Elevated Ag, LLC.  The Company's principal place of business shall be located at 1396 West Herndon Avenue, Suite 110, Fresno, CA 93711 or at such other place within the State of California as the Members agree upon.

1.3     Purpose and Business of the Company. The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act. Notwithstanding the foregoing, the primary business of the Company shall be to acquire, develop and/or operate agricultural real property in California and for no other purposes except as such other purposes that are approved by the Members as provided in this Agreement. The Company shall acquire real property for farming purposes only if approved by Managers. The Company shall not engage in any other business without the approval of the Managers (as defined in Section 4.1).

1.4     Term.  The Company shall exist until dissolved by the Members in accordance with the terms of this Agreement or as required by the Act.

1.5     Resident Agent.  The name and address of the Company's resident agent for service of process in the State of California is Kevin Assemi 1396 West Herndon Avenue, Suite 110, Fresno, CA 93711.

1.6     Members.  The name of each Member is set forth above and in Section 2.1 of this Agreement.  Each Member shall keep the Managers informed of such Member's present mailing address and taxpayer identification number and such information shall be included in the Company's books and records.

## ARTICLE II
## MEMBERS; CAPITAL

2.1     Percentage Interests in Company.  In exchange for their initial capital contributions made by each Member as shown on the books and records of the Company, the Percentage Interests of the Company are held as follows:

| Member | Percentage Interest |
|--------|---------------------|
| Kevin | 45 percent |
| Jeremy | 5 percent |
| Devon | 5 percent |
| Malakan | 5 percent |
| Maricopa | 40 percent |

2.2     Additional Capital Contributions; Member Loans.

(a)     Additional Capital Contributions.  If the Managers (by vote of a majority of Managers with Kevin being at least one of such voting majority) determine that the Company requires additional capital to fund its operations, the Managers shall deliver a written capital call notice at least fifteen (15) days in advance of the funding date to the Members of the amount, timing, and reason(s) for the additional capital requirement; provided, however, that any capital call in excess of One Million and No/100ths Dollars ($1,000,000.00) shall be approved by all Members.  Without altering the preceding sentence, the Managers may establish a monthly (or other periodic) schedule for additional capital contributions, which may be amended from time to time.  If the Managers establish such a schedule and notify the Members thereof, it is not necessary to send further capital call notices regarding scheduled payments until the schedule is revised.

(b)     Failure to Make Capital Contributions.  Unless otherwise provided in this Agreement, all capital calls are mandatory and all Members are required to contribute the required additional capital in proportion to their respective Percentage Interests.  If any Member fails to make an additional capital contribution for any reason whatsoever and the amount of that Contribution is not loaned to the Company by the other Members in accordance with Section 2.5 within 15 days of the deadline for the capital contribution, the remaining Members shall have the right, but not the obligation, to purchase the entire Percentage Interest of the Member failing to make the additional capital contribution in accordance with Section 5.2 of this Agreement.  Such purchase shall not waive any remedies for the breach of this Agreement.  If the Company borrows funds as the result of any Member's failure to make a required additional capital contribution, in addition to other available remedies, the Company shall be entitled to reimbursement by each

defaulting Member for all related loan points/fees, interest and other related charges. Such charges shall not affect the defaulting Member's Capital Account balance.

2.3    Return of Contributions, Distributions. Except as otherwise provided in this Agreement, no Member shall have the right to receive the return or withdrawal of any Contribution from the Company, except upon the Company's dissolution. Except for distributions required by Section 3.4, a Member has no right to demand and receive any capital or other distribution from the Company. Except as specifically provided in this Agreement, no Member may be compelled to accept a distribution of any asset in kind.

2.4    Capital Accounts. A separate Capital Account shall be maintained for each Member in accordance with Code Section 704 and the Regulations thereunder.

2.5    Loans and Other Business Transactions. At the Company's request, any Member (including a Member who is a Manager) or any Manager may make or cause a loan to be made to the Company in such amount and on such terms as are mutually agreeable to the Manager and such Member or Manager. Further, the Manager may make or cause a loan to be made by the Company to third parties, including to Members or Manager of the Company or an entity in which a Member or Manager holds an interest, on such terms as are mutually agreeable to the Manager and such Member or Manager. Members may also transact other business with the Company, and in so doing shall have the same rights and obligations as are afforded to and imposed upon Persons who are not Members. All transactions between the Company and a Member and/or Manager shall be at "arms length" (i.e., for full and fair consideration and adequate security).

2.6    No Interest. Members shall not be paid interest on their Contributions.

2.7    No Personal Liability. No Member shall have personal liability for any obligation of the Company, except as expressly provided by law.

2.8    Meetings and Voting. Meetings will be held at such times and place as the Managers or one or more Members holding at least a majority of the Percentage Interest may designate. Notice of the time, date, and location of the meeting shall be given by the Managers to all Members at least forty-eight (48) hours prior to the meeting. Any Member may waive notice of a meeting. The attendance of a Member at any meeting will constitute a waiver of notice of such meeting, except where a Member attends such meeting for the express purpose of objecting to the transaction of any business because such meeting was not lawfully called or convened. The presence of one or more Members holding at least a majority of the Percentage Interests at a meeting shall constitute a quorum for conducting business at the meeting. Except as otherwise required by this Agreement or the Act, the affirmative vote or approval of one or more Members holding at least a majority of the Percentage Interests of the quorum at a meeting will constitute the act of the Members. A Member who is present at a meeting at which action on any matter is taken will be presumed to have assented to the action unless a dissent is entered in the meeting minutes or such Member files a written dissent to such action with the Person acting as secretary of such meeting before the adjournment of such meeting or forwards such dissent by registered mail to the Company immediately after the adjournment of such meeting. The right to dissent will not apply to a Member who voted in favor of such action. A Member may participate in a meeting by means of telephone conference or similar electronic communications equipment (including video conferencing via third-party providers such as Zoom and Microsoft Teams) by which all persons participating in

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

the meeting can hear each other at the same time. Such participation will constitute presence at the meeting. Any action required or permitted to be taken at a meeting may be taken without a meeting if the Members holding at least a majority of the Percentage Interests approve the action under this Agreement or consent thereto in writing. Reasonably prompt notice of the taking of any action without a meeting by less than the unanimous written consent, together with a copy of the action taken, will be given to those Members who have not consented in writing. The transactions of the Members at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice if a quorum is present and if, either before or after the meeting, each Member not present signs a written waiver of notice of a consent to the holding of such meeting or an approval of the minutes of such meeting.

2.9     Conflicts of Interest. The Members and Managers acknowledge and agree that (i) each Member and Manager, and their Affiliates, (A) may have, and are permitted to have, investments and other business relationships with Persons that provide goods or services to the Company and (B) may develop, and are permitted to develop, strategic relationships with and investments in business that may be competitive with or complimentary to the Company's business so long as such strategic relationships and investments in business (1) are not under consideration by the Company and (2) do not result in a negative financial impact on the Company's then existing operations, and therefore (ii)(A) each Member and Manager, and their Affiliates, will not be prohibited (by virtue of their investments in the Company or their service as a Manager or an officer) from pursuing or engaging in such activities, (B) each Member and Manager, and their Affiliates, will not be obligated to inform or present to the Company or any other Member or Manager of any such opportunity, relationship or investment, except where such opportunity, relationship or investment is related to an opportunity, relationship or investment under consideration by the Company, (C) no Member or Manager will acquire or be entitled to any interest or participation in any such activity by virtue of the participation therein by any other Member or Manager, or their Affiliate, and (D) the involvement of any Member or Manager, or their Affiliate, in any such activity will not constitute a conflict of interest with respect to the Company or any Member or Manager. Notwithstanding the foregoing, no Member or its Affiliate shall have become interested in (as owner, equityholder, lender, partner, joint venturer, director, limited liability company manager, officer, employee, independent contractor, agent, consultant or otherwise) a nursery for commercial agriculture other than any such interest held by the Company.

2.10     Confidentiality. Each Member acknowledges that it may receive Confidential Information of the Company, including Confidential Information regarding business opportunities being pursued by the Company. Each Member will, and will cause its Affiliates to keep confidential and not disclose, directly or indirectly, to any other Person or use for such Person's own benefit or the benefit of any other Person the terms of this Agreement or any Confidential Information; provided, however, that a Member may disclose the terms of this Agreement and Confidential Information:

          (a)     to (i) authorized directors, limited liability company managers, officers, employees, agents and representatives of the Company and (ii) lenders and prospective lenders of the Company, in each case, in the ordinary course of business in furtherance of the Company's purposes;

(b)      to such Member's spouse, Affiliates, auditors, lenders, attorneys or other agents who are advising such Member with respect to such Member's interest in the Company or such Member's rights and obligations under this Agreement and the agreements expressly contemplated hereby to which such Member is party, but only (i) for legitimate business purposes related to the management of such Member's interest in the Company or such Member's rights and obligations under this Agreement and the agreements expressly contemplated hereby to which such Member is a party and (ii) with a covenant from such Persons to maintain the confidentiality of such information in accordance with this Section 2.9; or

(c)      if the terms of this Agreement or such Confidential Information is required by any Law or Order; provided that as soon as reasonably practicable before such disclosure, the disclosing Member gives the other Members prompt written notice of such disclosure to enable the Company to seek a protective Order or otherwise preserve the confidentiality of such information.

Promptly after the expiration or termination of this Agreement, each Member will return to the Company or destroy, delete or erase (with written certification of such destruction, deletion or erasure provided to the Company upon request) all written, electronic or other tangible forms of this Agreement and all Confidential Information in such Member's possession or under such Member's control. After the date that a Member ceases to own any interest in the Company, such Member will not, directly or indirectly, retain any copies, summaries, analyses, compilations, reports, extracts or other materials containing or derived from this Agreement or any Confidential Information, except to the extent required by applicable Law or for such Member's legal compliance purposes and/or in accordance with such Member's internal document retention policies. Notwithstanding such return, destruction, deletion or erasure, the terms of this Agreement, all oral Confidential Information and the information embodied in all written Confidential Information will continue to be held confidential pursuant to this Section 2.10. Nothing in this Section 2.10 will be construed to limit or otherwise modify any confidentiality covenant in any other agreement between a Member and the Company or any of its subsidiaries. The termination of this Agreement and/or dissolution of the Company notwithstanding, this Section 2.10 will survive and continue in full force and effect in accordance with its terms indefinitely.

## ARTICLE III
## PROFIT, LOSS, AND DISTRIBUTIONS

3.1      <u>Allocations of Profits and Losses to Members</u>.  It is the intent of the Members that the tax allocations of the Company will meet the requirements for "substantial economic effect" of Section 704 of the Code, and the Treasury Regulations or similar authority promulgated thereunder.  The tax allocations set forth herein shall be interpreted consistently with the foregoing intent.  Except as set forth in Section 3.2, all items of Company Profit or Loss and any Company expenditure that is neither deductible nor properly chargeable to a Capital Account under Code Section 705(a)(2)(B) or treated as an expenditure under Regulation Section 1.704-1(b)(2)(iv)(i), shall be allocated for federal, state, local and foreign income tax purposes in accordance with the Percentage Interests.

3.2      <u>Special Allocations.</u>

(a) <u>Nonrecourse Deductions</u>.  In the event the Company incurs nonrecourse liabilities or Member nonrecourse liabilities within the meaning of Regulation Section 1.704-2(b)(3) and (4), this Section 3.2 shall be amended to provide for allocations of nonrecourse deductions, Member nonrecourse deductions, and items of minimum gain in accordance with the then-applicable Regulations.

(b) <u>Contributed Property and Book-Ups</u>.  Notwithstanding anything to the contrary herein, in accordance with Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 3.2(b) are solely for purposes of federal, state, and local taxes.  As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distribution pursuant to any provision of this Agreement.

(c) <u>Code Section 745 Adjustment</u>. At the request of any Member, the Company may elect to adjust the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b), and associated items of income, gain, loss, deduction or credit shall be specially allocated to the Members in a manner consistent with the applicable Regulations. Such election shall be made if a majority in Percentage Interests of the Members determines that such an election is in the best interest of the Company and a majority in Percentage Interests of the Members.

(d) <u>Allocations for Net Income, Gains, and Net Losses</u>. All net income, other gains and net losses shall be allocated to the Members in accordance with their Percentage Interests, unless otherwise specified in a deficit restoration obligation agreement.

3.3   <u>Distribution of Cash</u>.  Cash shall be distributed to the Members in proportion to their Percentage Interests periodically in the reasonable discretion of the Managers taking into account all working capital requirements, capital reserves and retention of capital for future Company acquisitions of property, and, <u>provided</u> that no distribution shall be made if, after giving effect to the distribution: (i) the Company would not be able to pay its debts as they become due, or (ii) the Company's total assets would be less than the sum of its total liabilities.

3.4   <u>Liquidation and Dissolution.</u>

(a) <u>Distribution</u>. Upon liquidation of the Company, and after payment of or provisions for all outstanding obligations of the Company, the Company's assets shall be distributed to the Members pro rata in accordance with the positive balances in their respective Capital Accounts, after giving effect to all prior contributions, distributions and allocations, and thereafter in accordance with the Members' Percentage Interests.

(b) <u>Deficit Balances</u>.  Except as otherwise set forth in a separate written agreement, in the event that after all allocations of gain, income and loss and after all distributions (in cash or in-kind) in liquidation, there exists a deficit balance in a Member's Capital Account, such Member shall not be required to contribute any amount to the Company or otherwise have liability to such deficit balance.

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

3.5     <u>General Distributive Provisions.</u>

(a)     <u>Timing</u>.   Except as otherwise provided in this Agreement, the Managers shall determine the timing and amount of all distributions in their sole and absolute discretion.

(b)     <u>In-Kind Distribution</u>.   If any Company assets are distributed in kind to the Members, those assets shall be valued on the basis of their agreed value.   Unless otherwise determined by the Managers, any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Members so entitled.   The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its agreed value, and the Profit or Loss shall be allocated as provided herein and be credited or charged to the Members' Capital Accounts prior to the distribution of assets in liquidation.

(c)     <u>Persons Receiving Distributions</u>.   All Profit and Loss shall be allocated and all distributions made to the persons shown on the Company's records to have been Members as of the last day of the taxable year for which the allocation or distribution is made.   If there is a transfer of a Percentage Interest or an Economic Interest during the taxable year, the Profit and Loss shall be allocated between the original Member and the successor on the basis of the number of days each held the interest during the taxable year.

3.6     <u>Modifications</u>.   The Managers are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article III if necessary to comply with the Code and the Regulations promulgated under Code Section 704(b), <u>provided</u>, that no such amendment shall materially affect distributions to a Member without the affected Members' prior written consent.

3.7     <u>Income Tax Provisions</u>.   The Members are aware of the income tax consequences of this Article III and attached Tax Addendum and agree to be bound by these provisions in reporting their shares of Profit, Loss, and other items for federal and state income tax purposes.

**ARTICLE IV**
**MANAGEMENT: RIGHTS, POWERS, DUTIES, AND INSURANCE**

4.1     <u>Management of Company Business</u>.   The Company shall be manager-managed.   The Members agree Kevin Assemi, Devon Yurosek, and Jeremy Yurosek shall manage and control the Company's business and affairs, for the benefit of all Members, as the "<u>Managers</u>" of the Company and each a "<u>Manager</u>."   The Managers shall have sole authority to manage the affairs of the Company.   Each Manager shall serve until their resignation.   The Managers shall not be required to devote all of his time to the affairs of the Company but shall devote such time, effort, and skill as may be necessary or appropriate for the successful conduct of the Company.   A Manager, or any of them, may resign from that position by delivering a written resignation notice to the Members, specifying the effective date of the resignation.   If, at any time, there is no Manager duly elected and acting under this Agreement, the duties of the Managers shall be performed by the Members of the Company.   Except as otherwise provided in this Agreement or by law, and subject to any right by the Member(s) to meet, confer and vote on the matter at issue and provided that a majority of Managers has approved or consented to such action, any Manager, acting alone, shall have the right, power and authority, on behalf and at the expense of the Company, to exercise (or cause to be exercised) all of the rights, powers and authority granted under the California Revised Uniform Limited Liability Company Act, and to execute such agreements and documents as are

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

required to exercise such powers, including the following:

(a)     Protect and preserve the right, title, and interest of the Company with respect to all of its assets;

(b)     Pay on behalf of the Company all taxes, assessments, and other charges imposed against the assets owned by the Company;

(c)     Perform all other obligations of the Company;

(d)     To the extent not covered by Section 7.2 keep such records of financial and other transactions as any Member reasonably may request, and in any event, such records as customarily are kept by similar well-managed organizations;

(e)     Prepare and deliver to the Members periodic oral or written reports (not less often than annually) as to the state of the business and affairs of the Company;

(f)     Use reasonable efforts to promptly comply with or appropriately contest all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, courts, departments, commissions or any other body exercising functions similar to those of any of the foregoing, which may be applicable to the Company and the operation and management of its business;

(g)     Enter into contracts in the name of and on behalf of the Company including short term and long-term loans collateralized by the Company's real and personal property including, without limitation, loans from institutional lenders;

(h)     Employ and dismiss from employment employees, managers, agents, independent contractors, brokers, escrow agents, attorneys, and accountants;

(i)     Prepare an appropriate accounting system, including prudent checks and balances mechanisms;

(j)     Delegate certain administrative duties to non-Members or Members acting as independent contractors, who may perform the following services under the supervision of the Managers:  Administer the day-to-day operations of the Company; serve as the Company's advisor and consultant in connection with policy decisions; and perform such other acts or services for the Company as the Managers, in their discretion, may approve, including the duties enumerated above; but all major policy and all investment decisions shall be made by or under the direct supervision of the Managers, unless otherwise provided in this Agreement;

(k)     Perform other normal business functions and otherwise operate and manage the business and affairs of the Company in accordance with and as limited by this Agreement and prudent business practices;

(l)     Loan surplus cash held by the Company and not otherwise distributable to the Members to third parties including entities owned or controlled by the Managers; and

(m)     Execute all documents required by or requested from federal, State, and local

- 8 -

governments on behalf of the Company.

4.2     Actions by Managers. Actions of the Managers shall be taken at meetings or as otherwise provided in this Section 4.2 by a majority. No regular meetings of the Managers need be held. Any two (2) Managers may call a meeting of the Managers by giving written notice of the time and place of the meeting at least forty-eight (48) hours before the time of the holding of the meeting. The notice need not specify the purpose of the meeting, nor the location if the meeting is to be held at the principal executive office of the Company. A majority of managers shall constitute a quorum for the transaction of any business at any meeting of the Managers. The transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice if a quorum is present and if, either before or after the meeting, each Manager not present signs a written waiver of notice of a consent to the holding of such meeting or an approval of the minutes of such meeting. Any action required or permitted to be taken by the Managers under this Agreement may be taken without a meeting if the Managers unanimously consent in writing to such action. Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another. The Managers shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of meetings, and all written consents to actions of the Managers.

4.3     Bureau of Reclamation Signature Authorization.   In addition to the authorizations described in Section 4.1 above, each of the Members hereby expressly authorizes any one Manager to sign certification or reporting forms for compliance with the Reclamation Reform Act of 1982 on behalf of each of the Members.  This authorization applies only to the certification and reporting of lands held or managed directly by the Company. Only one Manager's signature shall be required on any certification or reporting forms submitted by the Company.

4.4     Right to Meet, Confer and Vote.  Notwithstanding any other provision of this Agreement, except in exigent circumstances, no act shall be taken, sum expended, decision made or obligation incurred by the Company, which is enumerated below as a "Major Decision," unless all Members are notified in writing of the intent to make a Major Decision (the "Major Decision Notice") and the Members meet, confer and a majority of the Percentage Interests of the Members affirmatively approve the matter at issue.  A Major Decision includes any of the following:

(a)     Amendment of this Agreement;

(b)     Change in the nature of the Company's business;

(c)     Sell, lease, exchange, or otherwise dispose of all or substantially all of the Company's property with or without the goodwill of the Company, outside the Company's ordinary course of business;

(d)     Approve a merger or conversion under the Act;

(e)     Undertake any act outside the ordinary course of the Company's business; and

(f)     Any act that, pursuant to other provisions of this Agreement or applicable law, requires a unanimous vote by the Members.

- 9 -

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

4.5     <u>Additional Limitations on Managers' Power and Authority</u>. Without the written consent of a majority of the Percentage Interests of the Members, the Managers shall have no right to:

(a)     Do any act in contravention of this Agreement, or any act that would make it impossible or impractical to carry on the ordinary business of the Company;

(b)     Confess judgment against the Company; or

(c)     Possess Company property, or assigns rights to specific Company property, for other than a Company purpose.

4.6     <u>Performance of Duties, Liability of a Manager</u>. A Manager, in performing managerial duties, shall refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. A Manager shall not be liable to the Company or its members for monetary damages, except for (i) a breach of the duty of loyalty, (ii) a financial benefit received by the Managers to which the Managers are not entitled, (iii) intentional infliction of harm on the Company or a Member, or (iv) an intentional violation of criminal law. An action that otherwise would be a violation of the Managers' duty of loyalty to the Company may be ratified, after full disclosure of all material facts to all Members, by the holders of a majority of the outstanding Membership Interests not held by the Manager which is the subject of the vote.

4.7     <u>Insurance</u>. The Managers shall obtain on behalf of the Company liability insurance covering risks commonly associated with the business of the Company.  Such liability insurance shall have a "single limit" of at least $1,000,000.  The liability insurance shall cover the Company, the Members (including the Managers), and their agents.<u>Indemnification</u>. The Members and certain other parties specifically identified in this Section 4.9 shall be entitled to indemnification from the Company as follows:

(a)     To the fullest extent permitted by law, each Member (the "Indemnitee") shall be indemnified, defended and held harmless by the Company from and against all losses, claims, investigations, damages, liabilities, joint and several, expenses (including fees of experts, attorneys, investigators and other support personnel), costs, judgments, fines, settlements and other amounts arising from its performance of services or incurring of obligations on behalf of the Company, or its status as (i) a Member, (ii) a Manager, or (iii) a person serving as a director, officer, trustee, employee or agent at the request of the Company in another entity, which relate to or arise out of the Company, its property, business or affairs, regardless of whether the Indemnitee continues to be a Member, Manager, or a director, officer, trustee, employee or agent at the time any such liability or expense is paid or incurred, if the Indemnitee acted in good faith and in a manner it believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal proceeding, had no reasonable cause to believe its conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Indemnitee acted in a manner contrary to that specified in the preceding sentence.  Any indemnification pursuant to this Section 4.8 shall be made only out of insurance funds and the assets of the Company (including those distributed to one or more Members after the claim giving rise to the indemnification right arose).

(b)     To the fullest extent permitted by law, expenses (including legal fees) incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding shall be advanced from time to time by the Company prior to the final disposition of such matter, but the Company first may require an undertaking on behalf of the Indemnitee (in form and of a nature reasonably satisfactory to the Company) to repay such amount if it later is determined that the Indemnitee is not entitled to be indemnified as authorized in this Section 4.8.

(c)     The indemnification provided by this Section 4.8 shall be in addition to any other rights to which an Indemnitee may be entitled under any agreement, vote of the Members, as a matter of law or otherwise, and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

(d)     The Company may purchase and maintain insurance on behalf of each Member and such other persons as the majority of the Percentage Interests of the Members shall determine, against any liability that may be asserted against or expense that may be incurred by such person in connection with the Company's activities, regardless of whether the Company would have the power to indemnify such person against such liability under the provisions of this Agreement.

(e)     An Indemnitee shall not be denied indemnification in whole or in part under this Section 4.5 because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

(f)     The provisions of this Section 4.8 are for the benefit of the Indemnities and shall not be deemed to create any rights for the benefit of any other persons.

4.9     <u>Contracts between Members and Company</u>.  Subject to the limitations set forth in this Agreement, any Member (including a Manager) may directly or indirectly, through one or more corporations, partnerships, trusts or other entities in which such Member has an interest, contract on a fair and reasonable basis with the Company for any purpose(s) in furtherance of the business of the Company including, without limitation, loaning the Company money on terms and conditions acceptable to the Managers and the Member making such loan.

4.10     <u>Reimbursement of Expenses</u>.  Unless otherwise provided, the Managers shall be entitled to reimbursement in full from the Company for all direct, good faith expenses reasonably incurred in furtherance of the Company business.  If approved by a majority in interest of the Members, the Managers shall be entitled to a salary, or reimbursement from the Company for overhead expenses, including without limitation, rent, general office expenses, and salaries and compensation and fringe benefits of executives.  All expenses and obligations incurred to form the Company are expenses of the Company and shall be paid with Company funds (or if already paid by one or more Members, reimbursed to them).

4.11     <u>Dissociation</u>. Except as set forth in Article V, no Member may dissociate as a Member without the written consent of all other Members.  A Member that dissociates with such written consent shall divest his, her, or its entire Membership Interest before the effective date of dissociation in accordance with the provisions of Section 5.3. In the event a Member dissociates in violation of this Section, or Transfers his, her, or its Membership Interest in violation of section 5.1, his, her, or its Membership Interest shall be converted into a Transferable Interest and thereafter that Member shall only have the rights of a Transferee. Each Member acknowledges and

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

agrees that such conversion of Membership Interest on the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date of this Agreement. Whether with or without the written consent of the other Members, dissociation shall not release a Member from any obligation or liability under this Agreement accrued or incurred before the effective date of withdrawal.

## ARTICLE V
## TRANSFER OF INTERESTS AND WITHDRAWLS OF MEMBERS

5.1    <u>Transfer of Percentage Interest</u>. No Member may transfer all or any portion of a Percentage Interest without the written consent of the other Members.  The attempted transfer of all or any portion of a Percentage Interest in violation of this Article V shall be null and void and of no force or effect, except as required by law, and any such attempted transfer shall create a right in the other Members to purchase the Percentage Interest under Section 5.2.

5.2    <u>Purchase Option Under Certain Events</u>.

(a)    An option (the "<u>Option</u>") to purchase all of the Percentage Interest (the "<u>Optioned Interest</u>") of a Member (an "<u>Optionor</u>") for cash shall arise in favor of the other Members (the "<u>Optionees</u>"), upon the occurrence of any of the following events:

(i)    The voluntary or involuntary transfer or hypothecation of all or any portion of the Optioned Interest; the creation or execution of a judgment lien on the Optioned Interest; or a voluntary or involuntary transfer to the spouse or companion of a beneficiary of a Member; notwithstanding any contrary provision, the Option shall only apply as to the portion of the Optioned Interest transferred or hypothecated;

(ii)    The filing of a petition by or against a Member or the beneficiary of a Member that is a trust, under the provisions of the Bankruptcy Reform Act, Title 11 of the U.S. Code, as amended or recodified from time to time, or under any similar or other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of a Member; any Member becomes insolvent, makes a general assignment for the benefit of creditors that is not vacated within 30 days;

(iii)    The transfer of part or all of an interest in the Company in violation of this Agreement;

(iv)    The failure of a Member to make an Additional Capital Contribution in accordance with Section 2.2 above;

(v)    If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion of it, to that Member's spouse (an "<u>Award</u>"), then, notwithstanding that Award, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion of it, that was the subject of the Award, and the former spouse shall sell the Membership Interest or portion of it to that Member at the price set forth in Section 5.2 of this Agreement. If the Member has failed to consummate the purchase within 180 days after

the Award (the "Expiration Date"), the Company and the other Members shall have the option to purchase from the former spouse the Membership Interest or portion of it under Section 5.2 of this Agreement, provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award; and

(vi)    If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is Transferred to a Transferee other than (1) that Member or (2) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually, possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion of it from the estate or other successor of his or her deceased spouse or Transferee of his or her deceased spouse, and the estate, successor, or Transferee must sell the Membership Interest or portion of it at the price set forth in Section 5.2 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Members shall have the option to purchase from the estate or other successor or Transferee of the deceased spouse the Membership Interest or portion of it under Section 5.2 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

(b)    The Optionor shall give written notice (the "Option Notice") to the Optionees within ninety (90) days of the occurrence of an event giving rise to an Option under Section 5.2(a)(1)-(3) and 5.2(a)(5).

(c)    The purchase price (the "Purchase Price") for the Optioned Interest of the Member(s) shall be based upon an appraisal prepared by an appraiser familiar with agricultural land values selected by the Managers within 20 days of the Option Notice.  The appraisal shall not take into account any minority interest or lack of marketability discounts.  Optionees shall pay no less than twenty percent (20%) of the Purchase Price in cash or other immediately available good funds within thirty (30) days of delivery of the foregoing appraisal (referred to as the "Closing").  The balance of the purchase price will be paid by a execution and deliver of a promissory note given by the Optionees in favor of the Optionor bearing interest at the mid-term Applicable Federal Rate in effect as of the date of the note.  Principal and interest shall be paid in four equal annual payments beginning on the first anniversary of the note and continuing on the second, third and fourth anniversaries, at which time all remaining principal and interest shall be due.  The maker of the note shall have the right to prepay the note in part or in full at any time without penalty and shall contain such other terms and conditions as are commercially customary for a note of this type.

At Closing, the Optionor shall execute and deliver an assignment of the applicable portion of the Percentage Interest in favor of the purchase thereof.  From and after the Closing, the Withdrawing Member shall have no further right to receive distributions from the Company or participate in any decisions permitted to the Members.  Upon conclusion of the tax year in which the Closing occurs, the Optionor will be allocated a portion of the income, loss, and other tax items applicable to the period of their ownership and the Optionor shall be obligated to report such items on their income tax return in the normal course.

- 13 -

(d)     If the Option is exercised pursuant to this Section 5.2 in connection with an event that otherwise would cause the dissolution of the Company, the Company shall not dissolve, but instead shall continue in full force and effect.

(e)     The foregoing Option applies each time one of the events described in Section 5.1 or this Section 5.2 occurs, even if the Option previously has arisen with respect to the same Percentage Interest regardless of whether the Optionees previously waived or failed to exercise their right to purchase the Optioned Interest.

5.3     Purchase upon Disassociation and Withdrawal.  In the event that a Member elects to withdraw from ownership in the Company and disassociate in accordance with Section 4.13 (such Member being the "Withdrawing Member"), the Withdrawing Member shall give written notice of their election to withdraw to the Managers at least ninety (90) days before the effective date of withdrawal.  The Managers will give written notification to the non-Withdrawing Members of the election.  The non-Withdrawing Members shall have the right, but not the obligation, to purchase the entire Membership Interest of the Withdrawing Member on the terms and conditions set forth herein. Where the non-Withdrawing Members do not exercise the right to purchase the entire Membership Interest of the Withdrawing Member, the Withdrawing Member shall have no obligation to make or liability for additional capital contributions.

(a)     Election by non-Withdrawing Members.  Those non-Withdrawing Members who wish to purchase a portion of the Percentage Interest of the Withdrawing Member shall notify the Managers in writing of their election to purchase and how much of the Withdrawing Member's Percentage Interest that non-Withdrawing Member is electing to purchase.  If more than one non-Withdrawing Member elects to purchase the Percentage Interest of the Withdrawing Member, the non-Withdrawing Members may purchase their pro rata share of the Withdrawing Member's Percentage Interest.  If any non-Withdrawing Member elects to purchase less than their pro-rata share, then the other non-Withdrawing Members who have elected to purchase may purchase additional portions of the Percentage Interest.

(b)     Determination of Purchase Price.  For a period of 10 days from delivery of notice to the non-Withdrawing Members of the purchase right, the non-Withdrawing Members and the Withdrawing Member shall negotiate in good faith to determine a fair market value for the purchase and sale of the Membership Interest.  If the Withdrawing Member and the Non-Withdrawing Members are unable to reach agreement on a purchase price, then the two groups will attempt to agree on a single appraiser who will appraise the fair market value of the Company, without respect to discounts for lack of marketability of the Percentage Interest or lack of controlling interest.  If the parties are successful in appointing a single appraiser, the selected appraiser will establish the fair market value of the Company and the purchase price for the Percentage Interest of the Withdrawing Member shall be determined by multiplying the Percentage Interest (expressed as a percentage) by the fair market value determined by the appraiser.  The cost of this single appraisal shall be born one-half by the Withdrawing Member and one-half by the non-Withdrawing Members.

If the parties are not able to agree upon a single appraiser, then each group will select a single appraiser.  The two selected appraisers will then engage the services of a third appraiser.  All three appraisers will independently appraise the fair market value of the Company,

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

without respect to discounts for lack of marketability of the Percentage Interest or lack of a controlling interest. That appraised value which is neither the highest nor the lowest of the three appraised values, without application of discounts, will establish the fair market value of the Company and the purchase price for the Percentage Interest of the Withdrawing Member shall be determined by multiplying the Percentage Interest (expressed as a percentage) by the fair market value established by appraisal. Each group shall bear the cost of the appraisal completed by the appraiser which they selected and the cost of the third appraisal shall be born one-half by the Withdrawing Member and one-half by the non-Withdrawing Member.

(c)     Payment of Purchase Price and Transfer. The non-Withdrawing Members and the Withdrawing Member shall complete the sale of the Percentage Interest within 30 days of determination of the purchase price as set forth in (b) above (such completion of the sale being referred to herein as the "Closing"). In the event that there is more than one non-Withdrawing Member who has elected to purchase, the payment of the purchase price shall be specific to each non-Withdrawing Member which is purchasing. The non-Withdrawing Member shall pay no less than twenty percent (20%) of the total purchase price in cash or other immediately available good funds at Closing. The balance of the purchase price will be paid by a execution and deliver of a promissory note given by the non-Withdrawing Member in favor of the Withdrawing Member bearing interest at the mid-term Applicable Federal Rate in effect as of the date of the note. Principal and interest shall be paid in four equal annual payments beginning on the first anniversary of the note and continuing on the second, third and fourth anniversaries, at which time all remaining principal and interest shall be due. The maker of the note shall have the right to prepay the note in part or in full at any time without penalty and shall contain such other terms and conditions as are commercially customary for a note of this type.

At Closing, the Withdrawing Member shall execute and deliver an assignment of the applicable portion of the Percentage Interest in favor of the purchase thereof. From and after the Closing, the Withdrawing Member shall have no further right to receive distributions from the Company or participate in any decisions permitted to the Members. Upon conclusion of the tax year in which the Withdrawing Member has withdrawn, the Withdrawing Member will be allocated a portion of the income, loss, and other tax items applicable to the period of their ownership and the Withdrawing Member shall be obligated to report such items on their income tax return in the normal course.

5.4

5.5     Conditions To All Transfers. In addition to the restrictions set forth in Article V of this Agreement, all transfers of all or a portion of a Member's Percentage Interest must satisfy each of the following conditions.

(a)     No Qualification. The transfer can be effected without registration or qualification under federal and state securities laws;

(b)     Transferee Bound By Agreement. If the party purchasing the Percentage Interest is not an existing Member, then the party purchasing the Percentage Interest offered (the "Transferee") delivers to the Company a written agreement to be bound by this Agreement with respect to the transferred interest;

(c)     No Termination.  The transfer will not result in the termination of the Company pursuant to Code Section 708;

(d)     Tax Identification Number.  The Transferee delivers to the Company his taxpayer identification number and initial tax basis in the transferred Percentage Interest.

# ARTICLE VI
# DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

6.1     Events of Dissolution. The Company shall be dissolved upon the happening of the first to occur of (i) the vote of a Majority of the Percentage Interests of the Members to dissolve the Company, or (ii) the entry of a decree of judicial dissolution pursuant to Corporations Code §17707.03.  The foregoing events shall be the only events which shall cause a dissolution of the Company.

6.2     Procedure for Winding Up and Dissolution.  If the Company is dissolved, the Managers (or a Member if there are no Managers) shall wind up its affairs.  On winding up, the Company's assets shall be distributed first to creditors, including Members who are creditors, in satisfaction of the Company's liabilities, and then to the Members in accordance with Section 3.4.

6.3     Filing of Certificate of Cancellation.  Upon completion of winding up of the Company's affairs, the Managers shall promptly file the Certificate of Cancellation of Articles of Organization with the Secretary of State.  If there is no remaining Manager, such Certificate shall be filed by the last person to be a Member; if there are no remaining Members, or last person to be a Member, the Certificate shall be filed by the legal or personal representatives of the Company.

# ARTICLE VII
# BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTION

7.1     Bank Accounts. All Company funds shall be deposited in a bank account or accounts opened in the Company's name at such financial institution the Managers may reasonably choose. The Managers shall determine types of bank accounts.  Only the Managers and his designated agents shall have deposit and withdrawal authority.

7.2     Maintenance of Books and Records.  The Managers shall keep such complete and accurate Company books, records and financial statements as are required under the Act and as they reasonably deem necessary.  The books, records and financial statements shall be maintained on the cash method of accounting with generally accepted accounting principles consistently applied by the Company's primary accountants unless otherwise required by the Code.  The books, records and financial statements shall be maintained and available for inspection at the Company's principal office.

7.3     Rights to Inspect Books and Records; Receive Information.

(a)     Right of Inspection.  Each Member has the right to inspect and copy during normal business hours the books, records and financial information the Company maintains pursuant to Section 7.2, and to obtain from the Company promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

(b)    Tax Returns.  Each Member shall receive within 75 days after the end of each fiscal year such information as is necessary to complete federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for the fiscal year.

(c)    Reimbursement of Costs.  Unless otherwise expressly provided in this Agreement, the inspecting or requesting Member shall reimburse the Company for all reasonable costs and expenses the Company incurs in connection with such inspection and copying, including the production and delivery of Company books or records.

7.4    Annual Accounting Period. The Company's annual accounting period shall be its taxable year.  The Company's taxable year shall be selected by the Managers, subject to the requirements and limitations of the Code.

7.5    Tax Matters Member; Partnership Representative.

(a)    Appointment; Resignation.    KEVIN R. ASSEMI shall be the "partnership representative" as provided in Code Section 6223(a) (the "Partnership Representative").  The Partnership Representative can be removed at any time by a vote of a majority of the Members not then serving as the Tax Matters Member or Partnership Representative, as the case may be, whose removal is the subject of the vote (the "Other Members").  The Partnership Representative shall resign if it is no longer an officer, employee, shareholder, director, or member of the Company or any affiliate of the Company.  In the event of the Partnership Representative, as the case may be, a majority of the Other Members shall select a replacement.  If the resignation or removal of the Partnership Representative occurs prior to the effectiveness of the resignation or removal under applicable Treasury Regulations or other administrative guidance, the Partnership Representative, that has resigned or been removed shall not take any actions in its capacity as such except as directed by a majority of the Other Members.

(b)    Tax Examinations and Audits.  The Partnership Representative, with respect to tax years beginning on or after January 1, 2020, is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by the Internal Revenue Service, Franchise Tax Board, California Board of Tax and Fee Administration, or any other taxing authority (collectively, "Taxing Authorities"), including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Partnership Representative, as the case may be, shall promptly notify the Members of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon the receipt of a notice of final partnership administrative adjustment or final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit or resulting administrative or judicial proceeding.  Without the consent of a majority of the Members, the Partnership Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss, deduction, penalties, or additional tax owed with any Taxing Authority.

(c)    Tax Elections and Deficiencies.  The Partnership Representative, as to tax years beginning on or after January 1, 2020, in their sole discretion, shall have the right to make on behalf of the Company any and all tax elections.  Except as otherwise provided herein, the

- 17 -

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

Partnership Representative, in its sole discretion, shall have the right to take any actions that are available to be made or taken by the Partnership Representative or the Company under the BBA (including an election under Section 6226 of the Code), and the Members or former Members shall take such actions requested by the Partnership Representative.  To the extent that the Partnership Representative does not cause the Company to make an election under Sections 6221(b) (or the Company is not eligible to do so), or Section 6226 of the Code, (i) the Company shall use commercially reasonable efforts to make any modifications available under Sections 6225(c)(3), (c)(4), and (c)(5) of the Code, and (ii) the Members shall take such actions as requested by the Partnership Representative, including filing amended tax returns and paying any tax due under Section 6225(c)(2)(A) of the Code or paying any tax due and providing applicable information to the Internal Revenue Service under Section 6225(c)(2)(B) of the Code.  The Partnership Representative shall equitably apportion any imputed underpayment among the Members (including former Members) based on their interests in the Company for the reviewed year with respect to the  imputed underpayment.  In determining each Member's share of an imputed underpayment, the Partnership Representative shall take into account (by reducing the amount of an underpayment apportioned to a Member) any modifications to the imputed underpayment attributable to a Member under Code Section 6225(c)(2), (c)(3), (c)(4), or (c)(5).  Any such payment made by a Member or former Member shall not be treated as a capital contribution.  Any amount not paid by a Member or former Member within 60 days of a request by the Partnership Representative shall accrue interest at the applicable federal rate.

(d)     _Tax Returns and Tax Deficiencies_.  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign, or other income tax return with the treatment of the item on the Company's return.  Any deficiency for taxes imposed on any Member or former Member (including penalties, additions to tax or interest imposed with respect to such taxes, and any taxes imposed pursuant to Section 6226 of the Code, as amended by the BBA) shall be paid by such Member or former Member, as the case may be, and if required to be paid (and actually paid) by the Company, will be recoverable from such Member or former Member.

(e)     _Income Tax Elections_.  Except as otherwise provided herein, the Partnership Representative shall have sole discretion to make any determination regarding income tax elections it deems advisable on behalf of the Company; provided that the Partnership Representative shall make an election under Section 754 of the Code, if requested in writing by another Member.

(f)     _Tax Returns_.  The Partnership Representative shall cause to be prepared and timely filed all tax returns required to be filed by or for the Company.

## ARTICLE VIII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with the other Members and the Company as follows:

8.1     _Preexisting Relationship or Experience_.  (i) He or she has a preexisting personal or business relationship with the Company, the Managers or the Members, or (ii) by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her

financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she is capable of evaluating the risks and merits of any investment in the Company and of protecting his or her own interest in connection with this investment.

8.2     Investment Intent.  He or she is acquiring the Percentage Interest for investment purposes for his or her own account and not with a view to or for sale in connection with any distribution of all or any part of the Percentage Interest.

8.3     Economic Risk.  He or she is financially able to bear the economic risk of an investment in the Percentage Interest, including the total loss thereof.

8.4     No Registration of Percentage Interest.  He or she acknowledges that the Percentage Interest has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his or her representations, warranties, and agreements herein.

8.5     Percentage Interest in Restricted Security.  He or she understands that the Percentage Interest is a "restricted security" under the Securities Act in that the Percentage Interest will be acquired from the Company in a transaction not involving a public offering, and that the Percentage Interest may be resold without registration under the Securities Act only in certain limited circumstances.

8.6     No Disposition in Violation of Law or this Agreement.  Without limiting the representations set forth above, he or she will not make any disposition of all or any part of the Percentage Interest which will result in the violation by him or her or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws, or the provisions of this Agreement.

8.7     Legends.  He or she understands that the certificates (if any) evidencing the Percentage Interest may bear appropriate restrictive legends.

## ARTICLE IX
## GENERAL PROVISIONS

9.1     Further Assurances.  Each Member as necessary shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as are appropriate to comply with the requirements of law for the Company's formation and operation and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the Company's property.

9.2     Notifications.  Any notices given hereunder shall be given by (i) personal delivery, (ii) overnight courier, or (iii) by first class mail, postage prepaid.  Notices to a Member shall be sent to the address set forth below that Member's name on the signature page hereto.  Notices to the Company shall be sent to the address set forth in Section 1.2.  A party may change its address for purposes of this section by providing the other parties the new address in writing.  Notices shall

be deemed to be received and effective when (i) personally delivered, (ii) one day after the date of forwarding by overnight courier, or (iii) if mailed, three days after the date of mailing.

9.3      Complete Agreement. This Agreement constitutes the complete agreement among the Members as to the subject matter hereof. It supersedes all prior written and oral statements, any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.4      Applicable Law, Jurisdiction and Venue. This Agreement shall be governed by and construed under California law. Any suit involving any dispute or matter arising under this Agreement may only be brought in Fresno County, California. All Members hereby consent to the exercise of personal jurisdiction by such court with respect to any such proceeding.

9.5      Section Headings. The headings herein are for convenience only and do not define or limit, the scope of this Agreement or the intent of its provisions.

9.6      Binding Provisions. This Agreement binds the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

9.7      Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the context so requires.

9.8      Severability. Each provision herein shall be considered severable; if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.9      Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.10     Legal Representation. The Members acknowledge that this Agreement has been prepared by legal counsel for Maricopa Orchards, LLC. Members other than Maricopa Orchards, LLC have been encouraged to seek legal and tax advice, as their individual interests may not be consistent with those of Maricopa Orchards, LLC. The non-Maricopa Orchards, LLC Members have either obtained such advise or have elected not to do so. Further, the Members acknowledge that they have not received tax advise from Maricopa Orchards, LLC or the Maricopa Orchards, LLC tax advisors.

**ARTICLE X**
**DEFINITIONS**

The following capitalized terms used in this Agreement shall have the following meanings:

"Act" means California's Revised Uniform Limited Liability Company Act (Corporations Code §§17701.01-17713.13), as amended from time to time.

"<u>Affiliate</u>" means, with respect to a particular Person, (i) any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person, (ii) if such Person is a partnership, any partner thereof (other than a limited partner), (iii) any of such Person's spouse, siblings (by law or marriage), ancestors and descendants and (iv) any trust for the primary benefit of such Person or any of the foregoing. Notwithstanding the foregoing, for purposes of this Agreement, none of the Members or their Affiliates, solely by virtue of being Members of the Company, shall be considered Affiliates of any other Members or such other Members' Affiliates of Affiliates of the Company or of its Subsidiaries.

"<u>Agreement</u>" means this Operating Agreement and attached Exhibits, as amended from time to time.

"<u>Capital Account</u>" means the separate account the Company maintains for each Member in accordance with Regulation Section 1.704-1(b).

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding revenue law.

"<u>Company</u>" means the limited liability company formed under this Agreement.

"<u>Confidential Information</u>" means all confidential, proprietary and trade secret information (including all tangible and intangible embodiments thereof) of the Company and its businesses, including information or data concerning contracts and contractual relations, and financial information (including any business plans, forecasts and projections); provided, however, that "Confidential Information" does not include any information that (i) has been made generally available to the public (other than through a Member's breach of this Agreement or, to such Member's knowledge, by a third-party's breach of a confidentiality covenant), (ii) is lawfully received from a third-party having rights in the information without restriction and received without notice of any restriction against its further disclosure, or (iii) is disclosed by the Company to a Member with an affirmative acknowledgment that the Member may further disclosure such information without restriction.

"<u>Contribution</u>" means any money, property, services, or promissory note as permitted in this Agreement or by the Act, which a Member contributes to the Company as capital.

"<u>Economic Interest</u>" means a Person's right to share in the income, gains, losses, deductions, or credits of, and to receive distributions from, the Company.  The term Economic Interest does not include any other Member rights, including the right to vote or participate in Company management, or any right to information concerning the Company's business or affairs.

"<u>Government Authority</u>" means any (i) national, federal, state, provincial, county, municipal or local (foreign or domestic) government; (ii) political subdivision of any of the foregoing or (iii) entity, authority, agency, ministry or other similar body exercising any legislative, executive, judicial, regulatory or administrative authority or functions of or

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

pertaining to government, including any commission, tribunal or other quasi-governmental entity established to perform any such function.

"Law" means any federal, state, local, municipal, foreign, international, multinational or other constitution, statute, law, rule, regulation, ordinance, code, principle of common law or treaty.

"Order" means any order, injunction judgment, decree, ruling, assessment or arbitration award of any Government Authority or arbitrator.

"Percentage Interest" means a Member's collective rights in the Company, including the (i) Member's Economic Interest, (ii) right to vote or participate in management (if any), and (iii) any right to information concerning the Company's business and affairs. Percentage Interest shall not affected by change in Capital Account balances including those resulting from additional Capital Contributions made by fewer than all of the Members.

"Person" means an individual, corporation, partnership, association, limited liability company, joint venture, trust, estate, or other entity, whether to not legal entities, or any government entity, agency or political subdivision.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, credit, loss or deduction required to be states separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss).

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Secretary of State" means the California Secretary of State.

"Subsidiary" means, with respect to a particular Person, (i) any corporation in which such Person and/or other Subsidiaries of such Person own or control, directly or indirectly, a majority of the corporation's total economic interest or the total voting power of the corporation's capital stock (without regard to the occurrence of any contingency) to vote in the election of the corporation's directors and (ii) any limited liability company, partnership, association, or other business entity in which such Person and /or other Subsidiaries of such Person (A) owns or controls, directly or indirectly, a majority of the partnership or similar ownership interest, (B) is allocated a majority of entity gains or losses or (C) is or controls any managing member or general partner.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

THE JEREMY J. YUROSEK TRUST,
DATED DECEMBER 26, 2008

_____
KEVIN ASSEMI

By: _____
JEREMY A. YUROSEK, Trustee

THE DEVON J. YUROSEK TRUST
DATED DECEMBER 26, 2008

By: _____
DEVON YUROSEK, Trustee

By: _____
JEFFREY A. YUROSEK, Trustee

MALAKAN INVESTMENTS, LLC, a
California limited liability company

By: _____
Nader Malakan, Member/Manager

MARICOPA ORCHARDS, LLC, a
California limited liability company

By: _____
Farid Assemi, Manager

- 23 -

## CONSENT OF SPOUSES

We, the undersigned, certify that:

1.    We are the spouses of the members who signed the foregoing Operating Agreement and who constitute the members of the limited liability company therein described.

2.    We have read and approve the provisions of the Operating Agreement, including but not limited to those related to the purchase, sale, or other disposition of the interest of a deceased, retiring, withdrawing, or terminating Member, as well as the option rights in favor of other members.

3.    We agree to be bound by and accept these provisions of the Operating Agreement in lieu of all other interests we, or any of us, may have in the Company, whether the interest may be community property or otherwise.

4.    Our spouses shall have full power of management of their interests in the Company, including that portion of those interests, if any, that is our community property, and they have the full right, without our further approval, to exercise their voting rights as Members in the Company, to execute any amendments to the Operating Agreement, and to sell, transfer, encumber, and deal in any manner with those Percentage Interests, including that portion of those interests, if any, that is our community property.

5.    The request for and/or obtaining our consent hereto is not intended and should not be construed as confirming the existence or non-existence of any community property interests in the Company.

Executed as of the date indicated below.

Dated: 02/16/2022

*Rachel Yurosek*
Name: Rachel Yurosek

Dated:

Name:

- 24 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Exhibit B</u>**
**Written Consent**
**(Attached)**

Complaint for Damages and Injunctive Relief

DocuSign Envelope ID: F1EC3A54-A35A-4EA8-A221-C1806399B582

Action by Written Consent
of the Members of
Elevated Ag, LLC, a California limited liability company

In accordance with Section 17704.07 of the California Revised Uniform Limited Liability Company Act and Section 2.8 of the Operating Agreement (the "Operating Agreement") of Elevated Ag, LLC, a California limited liability company (the "Company") dated effective as of September 16, 2020, the undersigned constituting Members holding a majority of the outstanding Percentage Interests of the Company take the following actions without a meeting:

REMOVAL OF MANAGER

1. Kevin Assemi is removed as a Manager of the Company as of the Effective Date of this Action.

APPOINTMENT OF ADDITIONAL MANAGERS

1. Nader Malakan and Farshid Assemi are hereby appointed to be Managers of the Company as of the Effective Date of this Action.

AMENDMENT OF OPERATING AGREEMENT

1. The Amendment to the Operating Agreement in the form attached hereto as Exhibit A is adopted.

2. In accordance with Section 17704.07(n)(2) of the California Corporations Code, the consent of all Members of the Company are being sought in connection with this Action.  Therefore, the Amendment to the Operating Agreement shall be effective upon this Action being approved by no less than a majority of the outstanding interests of the Company.

This Action by Written Consent of the Members of Elevated Ag, LLC, a California limited liability company is hereby taken by the undersigned constituting a majority of the Percentage Interest of the Members of the Company this 28th day of December, 2022.

Maricopa Orchards, LLC, a California limited liability company
as to a 40% Membership Interest

By: _____
DocuSigned by:
Farshid Assemi
A4F010C19423416
Farshid Assemi, Manager

*Signatures continue on next page.*

DocuSign Envelope ID: F1EC3A54-A35A-4EA8-A221-C1806399B582

The Jeremy J. Yurosek Trust, dated December 26, 2008
as to a 5% Membership Interest

By: _____
      Jeremy A. Yurosek, Trustee


The Devon J. Yurosek Trust dated December 26, 2008
as to a 5% Membership Interest

By: _____
      Devon Yurosek, Trustee

By: _____
      Jeffrey Yurosek, Trustee


Malakan Investments, LLC, a California limited liability company
as to a 5% Membership Interest

By: _____
      Nader Malakan, Member/Manager


_____
Kevin Assemi, as to a 45% Membership Interest

DocuSign Envelope ID: F1EC3A54-A35A-4EA8-A221-C1806399B582

Exhibit A

First Amendment to Operating Agreement
of
Elevated Ag, LLC

This First Amendment (the "First Amendment") to the Operating Agreement of Elevated Ag, LLC, a California limited liability company (the "Company") is made and effective as of December \_\_\_\_, 2022 (the "Effective Date").

Recitals

A.  The Company conducts its business pursuant to the terms of that certain Operating Agreement dated effective September 16, 2020 (the "Operating Agreement").

B.  The consent of all of the Members of the Company has been sought for this First Amendment and it has been adopted by a majority of the Percentage Interests of the Members.

Agreement

1.      Amendment of Section 1.5.  Section 1.5 of the Operating Agreement is amended as follows:

"1.5  Resident Agent.  The name and address of the Company's registered agent for service of process in the State of California is Farid Assemi 5260 N. Palm Ave., Suite 421, Mail Stop M, Fresno, CA 93704."

2.      Amendment of Section 2.2(a).  Section 2.2(a) of the Operating Agreement is amended as follows:

"(a)  Additional Capital Contributions.  If the Managers (by vote of a majority of the Managers) determine that the Company requires additional capital to fund its operations, the Managers shall deliver a written capital call notice at least fifteen (15) days in advance of the funding date to the Members of the amount, timing, and reason(s) for the additional capital requirement; provided, however, that any capital call in excess of One Million and No/100th Dollars ($1,000,000.00) shall be approved by all of the Members.  Without altering the preceding sentence, the Managers may establish a monthly (or other periodic) schedule for additional capital contributions, which may be amended from time to time.  If the Managers establish such a schedule and notify the Members thereof, it is not necessary to

DocuSign Envelope ID: F1EC3A54-A35A-4EA8-A221-C1806399B582

send further capital call notices regarding scheduled payments until the schedule is revised."

3. <u>Amendment of Section 5.1</u>.  Section 5.1 of the Operating Agreement is amended as follows:

"5.1 <u>Transfer of Percentage Interest</u>.  No Member may transfer all or any portion of a Percentage Interest (the "Subject Interest") without the written consent of at least a majority of those Members who are not the transferor of the Subject Interest.  The attempted transfer of all or any portion of a Percentage Interest in violation of this Article V shall be null and void and of no force or effect, except as required by law, and any such attempted transfer shall create a right in the other Members to purchase the Subject Interest under Section 5.2."

4. <u>Ratification</u>.  Except as expressly amended hereby, the Operating Agreement remains in full force and effect.

In Witness Whereof, the parties executing this First Amendment, which constitute a majority in interest of the Percentage Interest of the Members, have adopted this First Amendment as of the date first above written.

Maricopa Orchards, LLC, a California limited liability company
as to a 40% Membership Interest

By:  <u>   Exhibit – Do Not Sign   </u>
  Farshid Assemi, Manager

The Jeremy J. Yurosek Trust, dated December 26, 2008
as to a 5% Membership Interest

By:  <u>   Exhibit – Do Not Sign   </u>
  Jeremy A. Yurosek, Trustee

*Signatures continue on next page.*

DocuSign Envelope ID: F1EC3A54-A35A-4EA8-A221-C1806399B582

The Devon J. Yurosek Trust dated December 26, 2008
as to a 5% Membership Interest


By: _____Exhibit – Do Not Sign_____
       Devon Yurosek, Trustee

By: _____Exhibit – Do Not Sign_____
       Jeffrey Yurosek, Trustee

Malakan Investments, LLC, a California limited liability company
as to a 5% Membership Interest


By: _____Exhibit – Do Not Sign_____
       Nader Malakan, Member/Manager


_____Exhibit – Do Not Sign_____
Kevin Assemi, as a 45% Interest

CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 6, 2024.

By:     */s/ Zena M. Sin*
          Zena M. Sin